**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 08-1056, 08-2112, 08-2195


UNITED STATES OF AMERICA,

v.

THOMAS HEILMAN,
a/k/a FUZZY,
WILLIAM A. JOHNSON,
a/k/a TATOO BILLY,
JOHN NAPOLI,
a/k/a JUNIOR,

Appellants


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Nos. 07-cr-00075-1, 07-cr-00075-002, 07-cr-00075-4)
District Judge:  Honorable Harvey Bartle, III


Submitted Pursuant to Third Circuit LAR 34.1(a)
March 12, 2010

Before: BARRY, JORDAN, and VAN ANTWERPEN, Circuit Judges.

(Filed: April 21, 2010)


OPINION OF THE COURT

VAN ANTWERPEN, *Circuit Judge*.

In this consolidated appeal, we review myriad issues presented by Defendant-Appellants John Napoli ("Napoli"), William A. Johnson ("Johnson"), and Thomas Heilman ("Heilman) (collectively referred to herein as "Defendants") ranging from challenges to evidence presented at their trial to a variety of sentencing issues. For the reasons set forth below, we will affirm the Defendants' convictions on all counts, as well as the sentences of Napoli and Heilman, but we will vacate Johnson's sentence and remand for re-sentencing.

I.

A.

The facts in this case are lengthy and complex. On July 26, 2007, a grand jury returned a second superseding indictment against six individuals. Napoli, Johnson, and Heilman were charged as follows:

(1) Napoli was charged with conspiracy to distribute over 500 grams of crystal methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count I); three counts of violent crimes in aid of racketeering ("VICAR") in violation of 18 U.S.C. § 1959 (a)(3) (Counts II through IV); collection of credit by extortionate means, in violation of 18 U.S.C. § 894 (Count V); one count of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count IX); two counts of possession of a firearm by a convicted felon, in violation 18 U.S.C. § 922(g)(1) (Counts X and XI); and unlawful possession of a machine gun, in violation of 18 U.S.C. § 922(o) (Count XII).[1]

(2) Johnson was charged with conspiracy to distribute over 500 grams of

_____

[1] The Government withdrew Count XII at trial.

2

crystal methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count I); one count of VICAR (Count IV); possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (Count VI); and two counts of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Counts VII and VIII).

(3)　　Heilman was charged with conspiracy to distribute over 500 grams of crystal methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count I).

Prior to trial, some of their co-defendants pled guilty to some or all of the counts with which they were charged. Napoli, Johnson, and Heilman filed pretrial motions to suppress evidence on various grounds, all of which were denied after the District Court held suppression hearings on September 5 and 6, 2007. The court also denied Heilman's pretrial motion to sever his trial from his co-defendants.

The jury trial commenced on September 18, 2007. At the conclusion of the evidence, Napoli and Johnson orally presented Rule 29 motions alleging there was insufficient evidence to establish a nexus between the alleged VICAR assaults and the Breed outlaw motorcycle gang's (the "Breed") drug trafficking activities. Napoli separately contended that the evidence was insufficient to prove he unlawfully possessed firearms. The District Court denied these motions.

On October 4, 2007, the jury convicted Napoli of all counts charged, except Count III, of which he was acquitted. It found Johnson guilty on all charges, and it found Heilman guilty on Count I. In a special interrogatory, the jury determined that Napoli and Johnson conspired to distribute over 500 grams of crystal methamphetamine, and that

3

Heilman conspired to distribute less than 500 grams, but more than 50 grams, of crystal methamphetamine.

In separate sentencing hearings, the court sentenced: (1) Napoli to 432 months' imprisonment,[2] a term of five years of supervised release, forfeiture of specific tangible property, and a special assessment of $700; (2) Johnson to 360 months' imprisonment,[3] a five year term of supervised release, forfeiture of specific tangible property, and a special assessment of $500; and (3) Heilman to 235 months' imprisonment,[4] a term of five years

[2]    Napoli's crimes were divided into four groups of offenses. (R. at 665A-67A.) The court calculated an offense level of forty-six (46) for Group 1, which consisted of the drug conspiracy conviction. This offense level reflected a base of thirty-eight (38), United States Sentencing Guidelines § 2D1.1(c)(1) (Nov. 2007); a two-level enhancement for possession of a firearm, *id.* § 2D1.1(b)(1); a four-level enhancement for a leadership role in an organization of at least five persons, *id.* § 3B1.1(a); and a two-level enhancement for obstruction of justice, *id.* § 3C1.1. Because the offense levels for the other groups were more than nine (9) points less serious, the court only considered the level for Group 1. *See id.* § 3D1.4(c). With a criminal history category of V, after a one-level departure for over-representation, *see id.* § 4A1.3(b), the Guidelines yield a recommended sentence of life imprisonment, (R. at 668A.)

[3]    Johnson's crimes fell into two groups of offenses. (R. at 597A.) For the first group, the court calculated an offense level of thirty-nine (39), which consisted of a base offense level of thirty-six (36), USSG § 2D1.1(c)(2), and a three-level enhancement for performing a managerial or supervisory role, *id.* § 3B1.1(b). The court disregarded the second group because its offense level was more than nine (9) levels less serious. *See id.* § 3D1.4(c). The court then determined that Johnson was a career offender and, therefore, his criminal history category was VI. After a one-level departure for over-representation, the Guidelines yield a recommended term of imprisonment ranging from 360 months to life. (R. at 598A.)

[4]    The court calculated Heilman's offense level at thirty-four (34), based on a base offense level of thirty (30), USSG § 2D1.1(c)(5), and a two-level enhancement for possession of a dangerous weapon in connection with a drug conspiracy, *id.* § 2D1.1(b)(1). The court, however, concluded that Heilman was a career offender and, therefore, increased his offense level to thirty-four (34) in accordance with the

4

supervised release, and a special assessment of $100. The court also ordered the Defendants jointly and severally liable for the proceeds derived from the drug conspiracy, in the amount of six million dollars. All Defendants were sentenced in accordance with the 2007 Guidelines, which were in effect at the time of sentencing.

Defendants each filed a timely notice of appeal. Each Defendant raises a diverse set of issues on appeal and joins in those of his co-defendants. Napoli argues: (1) the District Court erred by admitting wiretap evidence because the wiretap applications failed to satisfy the necessity requirement; (2) the District Court improperly applied Fourth Amendment principles to the wiretap applications; (3) the District Court erred by failing to grant an evidentiary hearing; (4) the evidence was insufficient to support his convictions for Counts II, IV, and V; (5) the jury instructions regarding VICAR were erroneous; (6) joinder of Counts II through V for trial was prejudicial; (7) the admission of evidence on Counts II through V violated Federal Rule of Evidence 404(b); (8) the Government failed to timely disclose prior statements of testifying witnesses; (9) the District Court erred by calculating the amount of forfeiture based on gross proceeds rather than net income; (10) in determining his sentence, the District Court erred by finding the drug quantity and enhancements by a preponderance of the evidence; and (11) the District Court failed to consider the inequity of a sentence based on a 10:1 drug quantity disparity.

Guidelines. *See id.* § 4B1.1(b). For the same reason, Heilman's criminal history category was VI, which the court lowered by one-level for over-representation. *See id.* § 4A1.3(b). Based on an offense level of thirty-four (34) and a criminal history category of V, the Guidelines suggest a term of imprisonment of 235 to 293 months. (R. at 564A.)

5

Johnson makes the same first two arguments as Napoli, and also argues: (1) the District Court erred by failing to grant a *Franks* hearing; (2) the District Court erred by failing to suppress physical evidence; (3) the District Court violated his privilege against self-incrimination by allowing the introduction of wiretap evidence; (4) the District Court failed to grant a judgment of acquittal on Counts VI through VIII; (5) the District Court erred by sentencing him as a career offender; (6) the District Court erred by imposing a consecutive sentence under § 924(c)(1); and (7) the District Court violated his Fifth and Sixth Amendment rights in sentencing determinations.

Heilman argues: (1) the District Court abused its discretion in failing to grant him a separate trial; (2) the search of his home lacked probable cause; (3) the District Court erred by applying a dangerous weapons enhancement; (4) the District Court erred by departing only one criminal history category for over-representation and by believing it could not reduce his offense level for over-representation; and (5) his sentence was unreasonable.

B.

The Government prosecuted Defendants as members of the Breed, alleging they were involved in a conspiracy to distribute crystal methamphetamine.[5] Put simply, the

---

[5] Napoli, Johnson, and Heilman were arrested, along with ten others, pursuant to an extensive investigation of the Breed by the Pennsylvania State Police. They were among the seven of those arrested whose cases were adopted for federal prosecution in January 2007.

6

evidence offered at trial indicated that the Pennsylvania Chapter[6] of the Breed was subject to Napoli's control, who became president of the chapter in early 2004. Between January 2003 and June 2006 the organization allegedly distributed over 125 pounds of methamphetamine.

The Breed has a hierarchical structure with many members. As president, Napoli had the ultimate authority over the Breed enterprise. Breed officers have authority over regular members, hang-arounds, and prospects. Napoli appointed Johnson to be an executive member of the Pennsylvania Chapter. The evidence indicated that Johnson was a principal methamphetamine supplier to the Breed drug enterprise, and obtained methamphetamine, in turn, from his supplier Robert Traverse. Heilman served as a regular member in the Breed, and would sell drugs to the enterprise's retail customers. The Breed has a club house at 3707 Spruce Street in Bristol, Pennsylvania, where it holds weekly meetings to discuss club business, a practice referred to as going to "church."

In light of the diversity of Defendants' claims, we will organize the facts in relation to those claims.

1.

Napoli's and Johnson's principal issue on appeal is that law enforcement violated their rights by electronically intercepting communications on their phones. The Pennsylvania State Police sought and obtained wiretaps for two phones used by Johnson

---

[6] The Breed organization also has chapters in New Jersey and Ohio.

and one phone used by Napoli pursuant to their investigation. On April 13, 2006, Pennsylvania Superior Court Judge Jack A. Panella authorized a thirty-day wiretap for cellular telephone (215) 647-3165, registered to John Smith but used by Johnson ("Johnson 1"). Judge Panella also signed a thirty-day extension order for Johnson 1; all monitoring ended June 7, 2006. On May 3, 2006, Judge Panella authorized two more wiretaps for: (1) cellular number (215) 768-4612 registered to Bridget Dale and used by Johnson ("Johnson 2"), and (2) cellular number (215) 397-8074 registered to, and used by, Napoli. Judge Panella signed a thirty-day extension for both on June 2, 2006.

The Pennsylvania Attorney General applied for each wiretap. With each application, he incorporated an affidavit from Agent Kirk Schwartz[7] attesting to the probable cause and necessity for each wiretap. The affidavits contain a lot of similar information, and were likely modeled after each other, but each one was modified to reflect probable cause and necessity for each individual phone.

The wiretap affidavits, particularly the affidavit in support for a wiretap on Johnson 1, rely principally on the information provided by two informants. The investigation of the Breed commenced in 2005 while law enforcement agents were investigating another outlaw motorcycle gang, the Warlocks. Pursuant to that investigation, law enforcement arrested David Serviolo ("Serviolo"). To avoid

---

[7] At the time of the investigation and trial, Agent Schwartz was employed by the Pennsylvania Office of the Attorney General, in the Bureau of Narcotics Investigation and Drug Control.

prosecution, Serviolo agreed to cooperate and provide information regarding the Breed's drug trafficking activities.

Serviolo became a confidential informant ("CI"), and is referred to as CI#1 in the wiretap affidavits. In each affidavit, Agent Schwartz details how Serviolo provided a substantial amount of information about the Breed, due in part to his several-year relationships with both Napoli and Johnson, which commenced prior to his cooperation. In each affidavit, Agent Schwartz indicated that the information Serviolo provided was independently verified using surveillance, interviews, and information from other law enforcement. Law enforcement contended in the affidavits that Serviolo refused to testify. He did not change his mind until the federal prosecutor adopted this case in January 2007 and agreed to provide funding to protect Serviolo and his wife. Serviolo, however, apparently agreed to have his phone communications intercepted because law enforcement determined the interceptions would be necessary to corroborate any testimony he might offer.

In August 2005, Serviolo made controlled purchases from Jeffrey Grady ("Grady"), who was a Breed hang-around. In January 2006, Grady agreed to cooperate with the state investigation. At that point, he had already disassociated from the Breed.

Grady admitted to storing and distributing large quantities of drugs and money for Napoli. Grady said that during the summer of 2005 he served as a drug runner for Napoli by picking up pound quantities of crystal methamphetamine from Napoli, and then either

9

storing it for Napoli or running it to another Breed member. He also kept over $100,000 in cash at his house for Napoli.

Grady also alleged that Napoli threatened to extort $25,000 from him. Beginning in mid-2005, Grady and Napoli started a construction business together and completed several jobs together. In late 2005, after Grady ended his Breed membership, and after Napoli and Grady ended their professional relationship, Napoli alleged that Grady owed him $25,000, which Grady contends he did not owe. Grady testified that Napoli gave him one month to come up with the money, and when he did not pay Napoli kicked his back door and said, "[I]f this is the way you want to play, then we'll play this way." (Supp. App. at 564.) In response, Grady turned state's evidence.

The affidavit also detailed how Serviolo made a series of other controlled drug purchases while acting as a CI. On January 9, 2006, he participated in a controlled purchase of one gram of crystal methamphetamine from Breed member Brian Jones. Between February 7, 2006 and April 6, 2006, Serviolo made a series of small crystal methamphetamine purchases from Johnson. He made those purchases from, among other places, Johnson's residence at 3632 Morrell Street and The House of 1000 Tattoos.[8] After each purchase, Serviolo would turn over the drugs purchased. Serviolo testified at trial that he also bought additional small quantities of crystal methamphetamine from Johnson for his own personal use.

---

[8] The House of 1000 Tattoos is a business co-owned by Napoli and Johnson.

10

On June 3, 2006, Serviolo participated in a controlled purchase of crystal methamphetamine from Heilman at Heilman's residence at 813 Pine Street, Bristol, Pennsylvania. This event was surveyed by Agent Schwartz. The police provided Serviolo buy money. Serviolo entered Heilman's residence and emerged two hours later. When he emerged, he had spent the money and turned over three and one-half grams of crystal methamphetamine purchased.

The affidavits also detailed other evidence that law enforcement gathered by surveillance and other investigatory techniques. The affidavits for the wiretap on Johnson 2 and Napoli are much more elaborate because they include the evidence gathered against Napoli and Johnson through electronic interception on Johnson 1.

In the Johnson 2 and Napoli wiretap affidavits, Agent Schwartz indicates that Napoli was Johnson's ultimate source for methamphetamine. In the affidavit for Napoli's wiretap, Agent Schwartz elaborates, explaining that Napoli may not actually hand Johnson the methamphetamines but approves acquisition of the product. Agent Schwartz also testified to a grand jury that Johnson acquired methamphetamine from someone named Robert Traverse.

In each affidavit, Agent Schwartz included a section entitled "Need for Interception" to explain why wiretap interception was necessary and why normal investigative tools precluded law enforcement from obtaining sufficient evidence to prosecute. In all three affidavits, Agent Schwartz acknowledges that investigators were

11

able to get some information from Serviolo, Grady, and other cooperating witnesses, but suggests that the informants' access to information was limited.

Specifically, Agent Schwartz indicates that Serviolo was unable to get sufficient information about the full scope of the organization or about sources of the methamphetamine. (*See* R. at 906A-907A (noting "he . . . could not provide direct testimony regarding the full scope of Johnson's involvement in the crystal methamphetamine enterprise . . . . The confidential informant does not have the ability to approach any of Johnson's sources for crystal methamphetamine."); R. at 982A (noting "[a]lthough the confidential informant was able to supply some information . . .[he or she] is not able to supply enough information concerning persons involved in the higher echelon of the organization, including the acquisition and/or manufacture of crystal methamphetamine"); R. at 1064A (same).) The affidavit does not mention that Serviolo was offered, but declined, an opportunity to become a prospective member of the Breed.

Agent Schwartz also asserted that investigators had limited success with physical surveillance, without an accompanying wiretap, because Breed members are very aware of their surroundings and practice counter-surveillance measures. Agent Schwartz lists what he characterizes as "[t]wo very good examples of their counter surveillance abilities" in all three affidavits: (1) during a surveillance on Old Route 13, a Breed member indicated that he was aware of the surveillance by brandishing a bowie knife, and (2) while an undercover officer was photographing a residence of a Breed member, the

12

member immediately noticed the agent and followed him. (R. at 908A-909A; 984A-985A; 1066A-1067A.) These circumstances arose when law enforcement were surveying Breed members other than Napoli or Johnson.

In both applications for the Johnson wiretaps, Agent Schwartz expresses concern that frequent physical surveillance would be noticed by Breed members because it would require law enforcement to survey the same locations repeatedly. In the Napoli application, Agent Schwartz also expresses concern, based on intercepted communications, that Napoli has sources for confidential police information which would aid in the Breed's counter-surveillance tactics.

Agent Schwartz indicated that video surveillance has its limitations because it can only to be used to determine that people visited particular locations, not the purpose of those visits. He found the use of search warrants or grand jury indictments problematic because they would notify the targets of the investigations. He acknowledges that "the use and installation of an active pen register, trap and trace device alone will not provide information that will fully define the scope" of the organization. (R. at 1072A.) Although it will reveal call patterns, it will not aid law enforcement in getting information about who is supplying drugs, or enable successful prosecutions.

2.

Law enforcement conducted several searches pursuing its investigation. On June 5, 2006, Judge Panella issued three, sealed, nighttime search warrants for: (1) 3632 Morrell Street, (2) 4648 Bergen Street, and (3) 8609 Jackson Street.[9]

The evidence at trial indicated that Johnson shared the 3632 Morrell Street residence with his girlfriend, Jennifer Wozack, but does not indicate whether Johnson owned or leased this residence. Agent Schwartz indicated that this warrant was executed on June 6, 2006 at 1:15 a.m. A special operations group approached the front door and knocked. After forty seconds with no answer, the officers forcibly entered the house. Johnson, who was in the residence at the time, was placed under arrest.

The warrant indicated that the items to be searched for and seized included:

> "Methamphetamine, other controlled substances, items used to package, weigh, use, manufacture, store, and cut controlled substances, United States currency, documents, including owe sheets, customer lists, indicia, and/or other items which by themselves are indicative of drug trafficking and/or manufacturing, any weapons used as part of the drug trafficking trade and/ or items which are indicative of membership in a corrupt organization."

 (R. at 1247A-1248A.)

During the search officers recovered various items from the dining room. From shelving, officers found a blue Adidas shoe box containing five individually wrapped containers of crystal methamphetamine. Law enforcement also found a nine millimeter handgun, which was loaded, on top of a dining room hutch. The gun contained thirteen rounds of ammunition. The agent testified, "[f]rom where I was sitting, if I took one step

---

[9] The search of 8609 Jackson Street is not subject to this appeal.

14

to my right I could grab the shoebox [containing methamphetamine]. From where I was sitting if I make one step to my left I could reach up and grab the 9 millimeter off the dining room hutch." (Supp. App. at 164.)

From a strong box found in the front hallway, police recovered two ounces of methamphetamine, two vehicle titles, some unopened syringes, a leather case containing a digital scale and a small packet of cocaine. Police also found a black and silver case containing seven explosive devices, some edged weapons, some steroids, and a sandwich bag with several nine millimeter rounds. Law enforcement also recovered Breed paraphernalia, various records for Johnson and Wozack, jewelry, a photo, and other miscellaneous items.

Agent Jeffery Aster led the search of the Morrell Street residence. He testified that while at the residence, he listed all of the items seized in a rough inventory, which he re-copied in a more legible form. He testified that he left all the legible copies of the inventory at the residence, as well as the face sheet of the search warrant. As a result, Agent Aster only took the rough inventory list with him and asked another agent to update that inventory with any additions only included on the legible inventory.

Law enforcement also searched Johnson's other residence that night, 4648 Bergen Street, which he shared with his wife, Stacy Johnson. The record is unclear as to whether Johnson did or did not own this residence.

15

Officers executed this warrant at 2:30 a.m. on June 6, 2006. Agent Schwartz did not accompany officers on this search, but testified that he was told by the lead officer, Samuel Nieves, what transpired. The officers knocked on the door. Stacy Johnson answered and permitted the officers to enter. After completing the search, the officers left an inventory receipt detailing everything taken, as well as the face sheet of the search warrant.

At the Bergen Street residence, the police recovered a revolver located in the upstairs bedroom. They found the gun in a dresser drawer which contained "female clothing, underwear, socks, so on and so forth." (Supp. App. at 192.) The police also recovered a shotgun from a closet in the same bedroom, next to Johnson's Breed colors.[10] At 7:19 a.m. that morning, police intercepted a call between Stacy Johnson and Napoli, during which she told him, "I have the paper of the stuff [taken]." (R. at 220A.)

Johnson alleges that the officers took numerous items outside the scope of the warrant from his two residences. Specifically, he contends officers seized confidential attorney client materials and private medical records.

On June 6, 2006, Judge Panella issued an additional search warrant for Heilman's residence at 813 Pine Street in Bristol, Pennsylvania. The warrant affidavit included a description of the controlled purchase committed by Serviolo at that address, three days earlier. From Heilman's residence, law enforcement recovered 7.29 grams of crystal

---

[10] Breed "colors" are patch insignias. They often adorn the back of denim vests.

16

methamphetamine. They found a small plastic bag of crystal methamphetamine in a blue eye-glasses case that was located in the living room on a desktop, as well as additional bags on a table in the kitchen. Police discovered a .22 caliber rifle in the first-floor bedroom, under a couch. Police also recovered five knives and one dagger in a second-floor bedroom, some of which was under a chair. They found five swords and a pick axe in a second-floor bedroom. In addition, they recovered assorted ammunition, various pieces of Breed paraphernalia including photos, decals, and business cards, and over two dozen weighted batons.

Law enforcement also searched Napoli's residence at 268 Appletree Drive, Levittown, Pennsylvania.[11] During the search the police discovered a Ruger Model nine millimeter pistol, loaded with fourteen rounds, and a Kel-Tech Model nine millimeter pistol, loaded with eleven rounds, from a safety deposit box on the left-hand side of the bed in the first-floor master bedroom. The police also recovered a Federal Box with a separate magazine loaded with thirteen rounds of nine millimeter ammunition.

The police seized other items pertaining to the Breed. For example, law enforcement recovered a computer which contained records of Breed club laws, prospective laws, and funeral bylaws. Police also found photos and documents relating to the Breed.

3.

---

[11]     Napoli did not challenge the search of his house at 268 Appletree Drive in Levittown, Pennsylvania. This search also occurred on June 6, 2006.

With regard to the gun possession charges, law enforcement recovered guns in Johnson's two residences, along with drugs and other proceeds. In addition, Serviolo testified that, in March 2006, he went to Johnson's Morrell Street residence to buy methamphetamine for his personal use. When Serviolo entered, he saw Johnson, with a handgun in one hand, stuffing cash into a portable safe with the other. Serviolo also testified that, on May 11, 2006, Johnson asked Serviolo to help him move several large firearms, dynamite, and about one pound of methamphetamine from Morrell Street to Johnson's Bergen Street residence. Another witness testified that when he accompanied Johnson to a Hooters Bike night, Johnson had a gun in his vehicle.

In addition to the two nine millimeter handguns recovered from Napoli's Appletree Drive residence, Agent Schwartz testified that Napoli controlled eighteen firearms and one machine gun stored in two storage lockers. Both lockers were registered to John Wilson, a roommate of cooperating witness, Eric Loebsack ("Loebsack"). Loebsack testified that he rented the lockers at Napoli's direction. Napoli instructed him to obtain the lockers in someone else's name to avoid detection. Loebsack testified that most of the weapons had come from Bobby Freedberger, a former Breed member who was ousted by the Breed.

Another witness, David Frenier ("Frenier"), testified that he was aware that Napoli kept the two nine millimeter firearms in his residence. He said Napoli originally kept the weapons in a cabinet, but moved them to the safe in the bedroom. Frenier said he never

18

saw Napoli open the safe, but did see Napoli hold one of the weapons in his hand one evening while attempting to load it. Frenier also testified that he saw Napoli pull an AR-15 firearm out of his car. On another occasion, he testified that he helped pack up a steel box full of fifteen different firearms and ammunition at Napoli's direction. He said the box ended up in a storage facility.

4.

The Government also presented evidence of various actions it characterized as "violent enforcement." (Gov't Br. 19.) One witness testified that before the Breed would discipline or oust a member, the executive board would vote on the proposition. Frenier indicated that Napoli had ultimate authority on everything, including intra-club discipline. A former Breed member, Christopher Quattrocchi ("Quattrocchi"), testified that in March 2003, Napoli and others participated in beating Thomas "Schnozz" Burke ("Burke") at Napoli's residence on Appletree Drive. Burke was a prospective member of the Breed. Apparently several members of the club, including Napoli and Quattrocchi, did not trust Burke because he was acting strangely due to an over-indulgent cocaine habit. Napoli, Quattrocchi, and others took Burke to a bar and then back to Napoli's residence. Napoli took out a drill with a Phillips head attachment and screwed it into Burke's arm.[12] Napoli later brutally beat Burke. After the beating, Burke fell asleep while still wearing his

___

[12] It is unclear if this act was merely punishment. Prior to putting the screw in Burke's arm, Napoli used the screwdriver on his own arm. Then, he challenged Burke to do the same. It was only after Burke refused to screw his arm that Napoli drilled a hole in his arm.

19

Breed colors. The Breed has a tradition where they will set on fire anyone who falls asleep wearing Breed colors. Quattrocchi testified that Napoli tried to set Burke on fire pursuant to this tradition, but he dissuaded Napoli from doing it because they were inside Napoli's residence. Burke sustained a fractured eye-socket and facial bone, among other injuries. Medical professionals had to insert a metal plate to mend the wounds. This assault formed the basis for Count II.

On November 24, 2005, Napoli, Johnson, Quattrocchi, and other associates allegedly beat the Breed's past-president, James Graber. Quattrocchi testified that others in the Breed clubhouse caught Graber attempting to steal money from a game machine in the clubhouse. At the next "church" meeting, the Breed executive board unanimously voted to oust Graber from the organization. One week later, at the following "church" meeting, Breed members assaulted Graber in various ways including: (1) Quattrocchi picked up Graber from behind and "slammed him down on the pool table"; (2) Johnson allegedly stomped on Graber's chest "like an accordion"; and (3) Napoli kicked, punched, and hit Graber with a pool stick. (Supp. App. at 298-99.) Napoli had requested that Loebsack bring his emergency medical equipment to the Breed meeting that night. Quattrocchi testified that he stopped the beating when it looked as if Graber could go into a coma or die, and called in Loebsack to treat him. After Loebsack treated him, Napoli directed Loebsack and others to go to Graber's house and take anything related to

motorcycles or the Breed. As a result of the assault, Graber spent four or five days in an intensive care unit at a hospital.

The government also produced evidence that Napoli stabbed a local bar patron, John Mauck ("Mauck"), at the bar of the Fraternal Order of the Eagles. A witness testified that several men walked in the bar with Breed emblems on their jackets. Napoli was among the men. The bartender asked the men to leave because the bar owners prohibit patrons from wearing motorcycle colors in the bar. The men looked ready to leave, but asked if they could finish their drinks. The bartender told them to leave right away, and the Breed members started fighting with the bartender. Napoli was swinging a knife around. Mauck tried to pick up Napoli and remove him from the bar. In the process, Napoli stabbed Mauck.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We exercise appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.

After a review of the parties' exhaustive briefs and the record, we will affirm all but Johnson's sentence, which we vacate and remand for re-sentencing consistent with the reasons below. Because the parties raise a variety of issues, some of which are unrelated to others, we will begin by addressing the Government's investigation and

21

collection of evidence, proceed to matters related to trial, and conclude by reviewing

Defendants' sentences.

## A.  Wiretaps and *Franks*

Defendants Johnson and Napoli assert that the District Court erred when it refused

to suppress evidence obtained through three wiretaps on the basis that the wiretap

affidavits did not establish that electronic surveillance of the Defendants was necessary.

Title III of the Omnibus Crime Control and Safety Street Act of 1968 empowers a judge

to authorize wire, oral, or electronic communication interceptions upon compliance by

law enforcement agents with statutory prerequisites.  18 U.S.C. § 2510 *et seq.*[13]  Under

federal law, a judge is permitted to authorize a wiretap if he or she finds the application

for the wiretap, submitted by law enforcement, establishes that:

> "(a)    there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . .;
> (b)    there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
> (c)    normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
> (d)    . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the

---

[13]    All three of the wiretaps in this case were originally sought under Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. §§ 5701-5781 (1978).  The Defendants argue that the wiretap affidavits violate federal, rather than state, law because the federal requirements apply to state-authorized wiretaps admitted into federal court.  *See United States v. Rickus*, 737 F.2d 360, 363-64 (3d Cir. 1984) (noting "evidence obtained in accordance with federal law is admissible in federal court – even though it was obtained by state officers in violation of state law").

commission of such offense, or are leased to, listed in the name of, or commonly used by such person."

18 U.S.C. § 2518(3).

We have determined that § 2518(3)(c) requires that an application for a wiretap include a showing of necessity. *United States v. Hendricks*, 395 F.3d 173, 180 (3d Cir. 2005). To make this showing, the affidavit must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This means the affidavit must completely explain why "normal investigative techniques would be of no avail." *Hendricks*, 395 F.3d at 180 (quoting *United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir. 1985)). The Supreme Court indicated that the necessity requirement exists to ensure that wiretaps are not resorted to where traditional investigative techniques could be effective. *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974); *United States v. Vento*, 533 F.3d 838, 849 (3d Cir. 1976).

We exercise de novo review to determine whether the application contained the requisite statement, and if we determine such a statement is present, we review the court's determination of necessity for abuse of discretion. *United States v. Phillips*, 959 F.2d 1187, 1189 (3d Cir. 1992). Here, the affidavits unquestionably contained statements of necessity entitled "Need for Interception," (R. at 906A, 981A, 1061A); therefore, our inquiry is whether those statements are complete and whether the District Court abused its discretion by finding necessity in these circumstances.

23

We have characterized the government's burden of proof for showing compliance with the necessity requirement as "not great." *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975). The Government's burden is minimal because we have adopted a pragmatic approach toward the necessity requirement, and will test the Government's showing in a "practical and commonsense fashion." *Vento*, 533 F.2d at 849 (quoting *Armocida*, 515 F.2d at 37). Thus, "the government need not prove to a certainty that normal investigative techniques will not succeed, but rather need only show that such techniques reasonably appear to be unlikely to succeed if tried." *Armocida*, 515 F.2d at 38 (quotation marks and citation omitted). The Government must fully explain, however, the basis for such a conclusion. *Vento*, 533 F.2d at 848. We have concluded that the Government has satisfied its burden if it shows a "'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997) (quoting *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992)).

Defendants Napoli and Johnson offer several arguments challenging the District Court's determination that the wiretap applications and affidavits established necessity. First, they contend that the wiretap affidavits contain many material misstatements and omissions that could have misled an issuing judge and, therefore, the District Court erred in failing to hold an evidentiary hearing to evaluate the applications and affidavits. Second, Napoli and Johnson argue that the District Court committed legal error by

24

assessing the wiretap applications and affidavits under probable cause rather than Title III standards.  Finally, they assert that the wiretap applications and affidavits are facially insufficient to establish necessity.[14]  Napoli additionally argues that the District Court erred by failing to suppress evidence gathered from the wiretap placed on Napoli's phone, because there was no independent showing of necessity for Napoli.  We address these arguments in turn.

1.

a.

Defendants' assertion that the District Court erred by failing to grant them an evidentiary hearing to consider any material misstatements or omissions in the wiretap affidavits raises two sub-questions: (1) whether the District Court erred in failing to grant them a *Franks* hearing, and (2) whether the District Court erred in failing to grant them a necessity hearing.  We answer both questions in the negative.

---

[14]  In his Reply Brief, Johnson asserts the Government incorrectly characterizes his and Napoli's challenge under the necessity requirement as facial.  He asserts that Defendants' attempt to obtain an evidentiary hearing on necessity belies this claim.  Napoli, however, explicitly makes a facial argument in his Opening Brief:  "Appellant Napoli submits that the government failed to make a facial showing, within the four corners of the affidavits, to establish the necessity for the Johnson 1, Johnson 2, and Napoli affidavits."  (Napoli Br. 35.)  Johnson joined this argument when he joined all his co-defendants' arguments.  Regardless, Defendants made, and we considered, non-facial challenges to the wiretap affidavits as well.

25

Napoli and Johnson argue in their opening briefs that the District Court committed error by failing to grant them a *Franks* hearing.[15] In *Franks v. Delaware*, the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant if the defendant can make the requisite preliminary showing. 438 U.S. 154, 155-56 (1978); *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). We have extended this right to permit challenges based on factual omissions from the warrant affidavit. *See Yusuf*, 461 F.3d at 383; *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000). The preliminary-showing requirement is intended to "prevent the misuse of a veracity hearing for purposes of discovery or obstruction." *Franks*, 438 U.S. at 170-71.

To obtain a *Franks* hearing, the defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 383. To meet this threshold, a challenger must present more than conclusory statements that the affidavit contains false statements or omissions. *Franks*, 438 U.S. at 171; *Yusuf*, 461 F.3d at 383 n.8. The challenger must specifically identify

---

[15] Notably, in his Reply Brief, Napoli contends, to the contrary, that analysis under *Franks v. Delaware*, 438 U.S. 154 (1978), is inapplicable to "wiretap challenges based upon necessity." (Napoli Reply Br. 12-13.) He argues instead that the District Court should have granted Defendants some other sort of evidentiary hearing to assess necessity. We address this argument in the next section.

allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument. *Franks*, 438 U.S. at 171. The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof. *Id.* Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing. *Id.*; *Yusuf*, 461 F.3d at 383 n.8. When demonstrating that the affiant omitted a material fact or included a false statement with the requisite *mens rea*, it is insufficient to prove the affiant acted with negligence or made an innocent mistake. *Yusuf*, 461 F.3d at 383. If the challenger provides sufficient proof and obtains a *Franks* hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination. *Id.* If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

Although we have not addressed the issue, most appellate courts have held that *Franks* hearings are also appropriate when a defendant is challenging whether there are false statements or omissions in an affidavit for a wiretap application that speak to the necessity requirement. *E.g.*, *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999); *United States v. Guerra-Marez*, 928 F.2d 665, 670 (5th Cir. 1991); *United States v. Cole*, 807 F.2d 262, 267-68 (1st Cir. 1986); *United States v. Ippolito*, 774 F.2d 1482, 1484 (9th

27

Cir. 1985). We need not decide today, however, whether a defendant is entitled to a *Franks* hearing to challenge misstatements or omissions related to a necessity finding in a wiretap application because the Defendants cannot make the requisite preliminary showing to obtain such a hearing.

We also need not decide today what standard of review to employ when reviewing the District Court's refusal to permit a *Franks* hearing. Normally, we review the denial of a motion for suppression for clear error as to the underlying facts and exercise plenary review as to its legality. *See United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005). We have not stated a precise standard of review where a District Court denied a *Franks* hearing, and other circuits are split on this matter. *See United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002). Three circuits employ clear-error review, *United States v. Skinner*, 972 F.2d 171, 177 (7th Cir. 1992), *United States v. Hadfield*, 918 F.2d 987, 992 (1st Cir. 1990); *United States v. One Parcel of Property*, 897 F.2d 97, 100 (2d Cir. 1990); two circuits review de novo, *United States v. Hornick*, 964 F.2d 899, 904 (9th Cir. 1992); *United States v. Mueller*, 902 F.2d 336, 341 (5th Cir. 1990); and one circuit reviews for abuse of discretion, *United States v. Fairchild*, 122 F.3d 605, 610 (8th Cir. 1997). Because the most demanding standard articulated by any court is de novo, and because the de novo standard of review is satisfied here, we need not determine the applicable standard today.

Even when reviewing the District Court's refusal to hold a *Franks* hearing de novo, it is clear the court did not err because neither Napoli nor Johnson made the requisite preliminary showing. *See Franks*, 438 U.S. at 155-56. Johnson did not offer before the District Court a single argument that even approximates this showing, nor does he offer one on appeal.[16] On appeal, Johnson contends that the District Court failed to hold a *Franks* hearing to assess any material misrepresentations or omissions in the wiretap affidavits, but does not offer a single example of a material misrepresentation or omission in support of his argument.[17] In Johnson's motion to suppress before the District Court, Johnson requested a *Franks* hearing because the initial affidavit relied almost exclusively on a CI who is a "known methamphetamine user and trafficker who

---

[16] Johnson does not specify in his Opening Brief whether the District Court erred in not holding a *Franks* hearing to assess whether there were false statements or omissions material to its finding of necessity or its finding of *probable cause*. It appears that Johnson only sought an evidentiary hearing to assess false statements or omissions regarding *necessity*. First, Johnson failed to point out any examples of false statements or omissions relating to a finding of probable cause in this section of his Opening Brief. Johnson did point out alleged false statements and omissions relating to a finding of necessity in a previous section of his argument, but does not suggest they are material to, or preclude, a finding of probable cause. Second, Johnson only discussed an evidentiary hearing in relation to establishing necessity in his Reply Brief.

Because Johnson does not expressly argue the District Court erred by not holding a *Franks* hearing to determine whether the wiretap affidavits contained misstatements or omissions material to a probable cause determination, and does not offer any examples or arguments of statements that negate a probable cause finding, we will not address this argument here.

[17] Johnson did point out alleged material misstatements and omissions in an earlier section of his brief arguing that the affidavit did not support necessity. We analyze whether these false statements or omissions are sufficient to constitute a preliminary showing below.

29

has a myriad of reasons to provide false information to law enforcement." (R. at 761A.) Johnson contended that a *Franks* hearing "will demonstrate the nature and extent of the falsifications and law enforcement's intentional and/or reckless reliance upon same." (R. at 764A.)

The fact that the CI in question is a methamphetamine user does not, in and of itself, indicate that any testimony he gave was false or unreliable. Moreover, Johnson neither explained the absence of nor offered any evidence in the form of an affidavit, witness testimony, or otherwise, that proves the CI was a drug user, explains why his drug use would encourage him to provide false information, or describes what sort of false information he believed the CI had given. *Franks*, 438 U.S. at 171; *Yusuf*, 461 F.3d at 383 n.8. Therefore, his allegation that the CI provided false statements which were used in the affidavit is exactly the sort of conclusory statement that is insufficient to meet the *Franks* preliminary threshold. *See Franks,* 438 U.S. at 171.

Napoli's arguments regarding a *Franks* hearing are inconsistent. In his motion before the District Court, Napoli lists examples of various misstatements in the affidavit, which he claims would negate a finding of probable cause. (R. at 795A-796A.) Napoli did not expressly argue, however, that the affidavit contains misstatements or omissions related to a necessity finding. (R. at 795A (noting the "Affidavit of Probable Cause contains material mis-statements of fact or excluded information relevant to the determination of probable cause").) Nevertheless, Napoli asserts in his Opening Brief on

appeal that a *Franks* "hearing would have been appropriate to evaluate appellants' claims" because the affidavits contain material misstatements or omissions relevant to a necessity finding. (Napoli Br. 40.) Napoli changes course in his Reply Brief, arguing that "*Franks* analysis is inapplicable to wiretap challenges based on necessity." (Napoli Reply Br. 12-13.)

"Generally barring exceptional circumstances, like an intervening change in the law or the lack of representation by an attorney, this Court does not review issues raised for the first time at the appellate level." *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 142 (3d Cir. 2001). Because Napoli arguably did not assert entitlement to a *Franks* hearing to inquire into the affidavit statements relevant to necessity before the District Court, his claim to this effect in his Opening Brief may be waived. Even if his argument is taken on the merits, however, he cannot prevail. Napoli and Johnson have not identified any allegedly false statement or omissions that warrant a *Franks* hearing in any event. Napoli's and Johnson's strongest arguments are that the section of the wiretap affidavits discussing the usefulness of CIs has material misstatements and omissions. Defendants argue: (1) that the affidavit misrepresents the CIs' ability to acquire information about the full scope of the organization because it omits the fact that Serviolo was offered Breed membership; (2) Johnson takes issue with the affidavits' suggestion that the CIs cannot approach Johnson's sources of methamphetamine; and (3) Napoli asserts that the affiant's claim that Serviolo would not testify is false.

31

Regarding the first claim, Defendants point to the memorandum discussing an interview between Serviolo and Agent Schwartz, pre-dating the wiretap application, which indicates that Serviolo informed Agent Schwartz that he had been invited, but declined, to join the Breed as a prospective member. (R. at 1322A-1323A.) Agent Schwartz did not mention Serviolo's invitation in the wiretap affidavits. Defendants contend the fact that Serviolo was invited to join the Breed "completely contradicts all the of [sic] assertions made by Agent Schwartz in both the Johnson and Napoli wiretap applications regarding the impossibility of infiltrating the Breed organization," or that a CI could access information about the scope of the organization. (Napoli Br. 16.) Johnson argues the omission of this information seems deliberate because the affiant incorporated the remainder of the interview with Serviolo into the wiretap affidavit.

A memorandum of Serviolo's pre-affidavit interview with Agent Schwartz, penned by Agent Schwartz himself, is precisely the kind of evidence one must put forward to make a substantial showing for a *Franks* hearing. *See Franks*, 438 U.S. at 171 (indicating an affidavit or sworn statement is the sort of offer of proof that must accompany a substantial showing). This memorandum demonstrates that Agent Schwartz knew, but omitted from his wiretap affidavit, the fact that Serviolo was invited to join the Breed. This showing, however, is insufficient to meet the *Franks* threshold because Defendants have not persuaded us that it was material. *See id* at 155-56 (indicating a substantial showing requires that the challenge make a "substantial preliminary showing" that a false

32

statement was made, that statement was made knowingly, intentionally, or with reckless disregard for the truth, and is "necessary" to the finding).  Because Serviolo declined Breed membership, he would not have access to more details about the organization's operations.[18]  Thus, law enforcement could not pursue this line of investigation and, therefore, this fact is not material to a necessity finding.[19]

Johnson contends that Agent Schwartz's assertion in the wiretap affidavit that "[t]he confidential informant does not have the ability to approach any of Johnson's sources for crystal methamphetamine" is also false.  (R. at 907A.)  He bases his assertion on the fact that the wiretap affidavit indicates that law enforcement surveyed Serviolo talking with Napoli on several occasions.  Because Agent Schwartz knew that Napoli is

---

[18]    Had Serviolo been willing to infiltrate the Breed, that would not have necessarily negated the necessity for obtaining wiretaps in this case.  The Government persuasively points out that Breed prospects have "lowly" status.  (Appellee's Br. 86-87.) Prospects are not admitted in weekly club meetings, let alone exposed to the full extent of Napoli's drug operation.  Instead, they are subjected to months of loyalty tests at the risk of violence to themselves if they are deemed unworthy. (*Id.*)

[19]    Napoli also challenges the affiant's claims that law enforcement misrepresented its ability to infiltrate the Breed because Agent Schwartz testified that he entered a bar that serves as a Breed hang out and was not identified.  Napoli offers Agent Schwartz's testimony in front of the Pennsylvania grand jury about his trip to the bar as proof of this misrepresentation. *Franks*, 438 U.S. at 171.  Napoli contends that this testimony belies the affiant's claim that the Breed cannot be infiltrated.  We agree with the Government's characterization of Napoli's claim as "absurd[]."  (Gov't Br. 89.)  The fact that an officer can enter a bar without being identified does not negate, in any way, the law enforcement officer's characterization that it would be hard to infiltrate the Breed.  Therefore, despite presenting evidence on this issue, Napoli did not make a substantial preliminary showing that the affiant made a false statement. *See Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

33

one of Johnson's sources, Johnson contends this evidence indicates that a CI could, in fact, approach Johnson's sources – contrary to the affiant's assertion.

Even if Agent Schwartz's statement that Serviolo cannot approach Johnson's sources is technically false, it does not entitle Defendants to a *Franks* hearing. Surveillance evidence of Serviolo talking to Napoli is sufficient to demonstrate that the assertion that CIs could not approach Johnson's sources is inaccurate. *See Franks*, 438 U.S. at 171 (indicating affidavit or sworn statement is the sort of offer of proof that must accompany a substantial showing). But, Johnson has offered no evidence that Agent Schwartz intentionally, knowingly, or recklessly wrote this statement to mislead the judge regarding Serviolo's access to Johnson's sources. *Id.* at 155-56. In fact, Napoli asserted in his brief that Agent Schwartz knew that Napoli was not Johnson's ultimate source for methamphetamine because he knew Robert Traverse was the ultimate source. Therefore, it is possible that Agent Schwartz negligently suggested Serviolo could not approach Johnson's sources, meaning that he could not approach Traverse. *See Yusuf*, 461 F.3d at 383 (indicating that proof an affiant included a false statement or omission in the wiretap affidavit negligently or by innocent mistake is insufficient to a *Franks* hearing). Because Defendants do not persuade us that there is evidence that Agent Schwartz wrote this statement knowingly, intentionally, or with reckless disregard for the truth, they have not made the substantial preliminary showing required for a *Franks* hearing. *See Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

34

Napoli contends that the affiant's assertion that Serviolo would not testify before a grand jury was false because, prior to engaging in consensual interceptions, Senior Deputy Attorney General Kishan Nair ("Nair") wrote a memorandum suggesting that Serviolo consented to interceptions to "corroborate his testimony." (Napoli Br. 24.) Although Nair's memorandum indicates that law enforcement felt "it necessary to consensually [sic] intercept the conversations which Mr. Serviolo has with the above individuals in order to effectively corroborate his testimony," nothing in the memorandum suggested that Serviolo consented to interceptions for that purpose. (R. at 1325A.) In fact, nothing in the memorandum suggests that Serviolo agreed to testify in this case. To the contrary, the record establishes that Serviolo refused to testify until the federal government took the case and agreed to provide Serviolo and his family protection. As such, we find this evidence insufficient to suggest the affiant made a false statement; therefore, it does not meet the *Franks* threshold. *Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

Johnson also takes issue with the affiant's statements about the CI, claiming that the information is "boilerplate," i.e. the affiant copied phrases about the CI's access to information and sources from a prior wiretap affidavit. Johnson offers as proof the wiretap affidavit from another investigation. (*See* R. at 1331A-1382A.) When compared, the necessity sections in each wiretap affidavit are noticeably similar. Evidence that two wiretap affidavits are similar, however, is not sufficient to warrant a *Franks* hearing

35

because it does not speak to whether these statements are false. Therefore, Johnson has not met the first prong of the preliminary showing for a *Franks* hearing, i.e. demonstrating that there is a false statement or omission. *Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

Defendants also raise several complaints regarding the affiant's representation of law enforcement's success with physical, video, and aerial surveillance. Defendants (1) assert that the wiretap affidavits omitted successful video and aerial surveillance, and (2) challenge statements regarding law enforcement's success with physical surveillance.

Defendants' complaint regarding the video and aerial surveillance is unavailing because there was no information to omit. Napoli indicates that law enforcement engaged in video surveillance on April 15, 26, and 28, 2006 and May 3, 2006; however, he points us to no place in the record which indicates law enforcement conducted *video* surveillance and our review suggests law enforcement conducted *physical* surveillance on those dates. Further, as the Government points out, the only aerial surveillance occurred after the last wiretap application was submitted. Therefore, the lack of information about these forms of surveillance is not an omission.[20]

---

[20] The fact that law enforcement used aerial surveillance after applying for the wiretap, and not before, is of no moment. We have held that "[t]here is no requirement that every investigative methodology be exhausted prior to an application for" wiretap interception. *Vento*, 533 F.2d at 849. All law enforcement must do is to show that other "normal" investigative techniques are impractical. *Armocida*, 515 F.2d at 37. Because aerial surveillance is expensive and invasive, it is not the type of normal investigatory technique that law enforcement must consider prior to applying for a wiretap. *See id.* (listing visual and aural surveillance, interrogating people with immunity, the use of

Defendants further challenge statements in all three wiretap affidavits concerning physical surveillance. The affidavits stated that law enforcement had limited success with physical surveillance, when unaccompanied by wiretap interceptions, because Breed members are "extremely aware of their surroundings" and practice counter-surveillance measures. (R. at 908A, 984A, 1067A.) It further described two circumstances when Breed members exhibited awareness that law enforcement were surveying them. Napoli contends that this statement misrepresents the government's successes with physical surveillance. Johnson, in contrast, argues that the two examples the government offers are problematic because neither occurred when law enforcement was surveying Napoli or Johnson.

Neither Defendant offers substantial evidence that these statements are misrepresentations. Napoli points to myriad circumstances when law enforcement did conduct physical surveillance, but nothing he points to proves that law enforcement could meet its investigatory objectives through physical surveillance, or that Breed members did not practice counter-surveillance. Johnson points to evidence that the examples listed in the affidavit related to investigations of Breed members other than either Napoli or Johnson. Moreover, he points out that there is no evidence that surveillance of Johnson has ever failed. But again, that evidence does not indicate that Agent Schwartz misrepresented the usefulness of physical surveillance. It merely calls into question the

warrants, and confidential informants as normal investigative techniques, but not aerial surveillance).

37

value of the examples offered. Therefore, even if the Defendants' assertions are taken at face value, they do not satisfy the preliminary showing requirement because they do not demonstrate the existence of a false statement or omission in the wiretap affidavit, or that the affiant made false statements or omissions with the requisite *mens rea*. *See Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

Napoli makes a general complaint that Agent Schwartz misrepresented the extent of law enforcement's knowledge about the Breed when it applied for the wiretaps. As proof of this assertion, Napoli points to the fact that the affiant stated that Napoli was Johnson's ultimate source for methamphetamine in the Johnson 2 and Napoli affidavits, (R. at 943A, 1020A), but provides Agent Schwartz's grand jury testimony wherein he identifies Robert Traverse, rather than Napoli, as Johnson's ultimate source, (R. at 1311A-1312A). Napoli also points to the fact that the affiant referred to Robert Traverse as Bob LNU, suggesting law enforcement did not know his identity, when the grand jury testimony indicates his identity was known.

Regarding Napoli's first example, the Government points out that following the affiant's suggestion that Napoli is Johnson's ultimate source, he explains that "although Napoli may not actually hand the methamphetamine to Johnson, he is, however, giving his 'blessing' to the acquisition of the product." (R. at 1020A.) Therefore, the affiant's knowledge that Robert Traverse was Johnson's source, and the statement that Napoli is the ultimate source, are not inconsistent. Because Napoli did not demonstrate that the

38

affiant's statement was false, he has not made the requisite showing for a *Franks* hearing. *See Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

Napoli's second example is equally unpersuasive. Napoli points out that Agent Schwartz discussed Robert Traverse in testimony in October 2006. Napoli contends that Agent Schwartz's testimony about Robert Traverse is evidence that Agent Schwartz knew, but did not disclose Robert Traverse's identity in the wiretap affidavits, when he referred to Traverse as Bob LNU. He asserts that the affiant did this to misrepresent that fact that he knew Robert Traverse's true identify. However, Agent Schwartz's testimony occurred after the completion of all three wiretap applications and after Robert Traverse had been arrested and identified. This evidence, therefore, does not prove that Agent Schwartz knew the identity of Bob LNU when he penned the wiretap affidavits, but only demonstrates that he eventually learned Bob LNU's identity. As a result, Napoli has not presented a substantial showing that Agent Schwartz misrepresented his knowledge regarding this information.

Napoli also characterizes as untrue Agent Schwartz's assertion that "active members of an [outlaw motorcycle gang] rarely, if ever, cooperate against one another." (R. at 1066A.) He offers Agent Schwartz's testimony as evidence that this statement is untrue, because Agent Schwartz identified several members of the Warlocks, another gang, who cooperated against each other. Again, Agent Schwartz's testimony is not inconsistent with his assertion in the wiretap affidavits – just because he testified that

several members of an outlaw motorcycle gang cooperated against one another does not undermine his assertion that such cooperation is rare. Therefore, Napoli's showing is insufficient to even establish that Agent Schwartz's assertion is false and, thus, obviously falls short of what is required for a *Franks* hearing. *See Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 378.

Although there may be minor inconsistencies between the wiretap affidavits and other evidence, Defendants have not successfully identified any true material misstatements or omissions, nor have they offered sufficient accompanying proof. Moreover, neither Napoli nor Johnson offers any evidence indicating that the affiant knowingly, intentionally, or with reckless disregard of the truth included these alleged misstatements or omissions in the wiretap affidavits. Therefore, we will affirm the District Court's denial of a *Franks* hearing regarding evidence related to proving necessity for a wiretap because, even reviewing this decision de novo, it is clear the Defendants did not meet the requisite preliminary threshold. *See Franks*, 438 U.S. at 155-56; *see also Stewart*, 306 F.3d at 304 (noting circuit split on proper standard of review for denial of *Franks* hearing).

b.

In his Reply Brief, and contrary to his Opening Brief, Napoli submits that *Franks* analysis is "inapplicable to wiretap challenges based on necessity." (Napoli Reply Br. 12-13.) Instead, he suggests that he is entitled to a "necessity" hearing. (*See id.* at 11 (citing

40

argument wherein Napoli differentiated between a *Franks* and a necessity hearing).) Napoli does not describe what this necessity hearing would entail, except to suggest that it includes an inquiry into any material misstatements or omissions regarding necessity as part of the reviewing court's duty to assess necessity. His argument raises the issue of whether a defendant is entitled to an evidentiary hearing, distinct from a *Franks* hearing, if he or she challenges the factual statements or omissions in a wiretap application related to a finding of necessity. We answer this argument in the negative.

We have never recognized a necessity hearing, separate from a *Franks* hearing, to assess whether a wiretap affidavit contained factual misstatements or omissions material to a necessity finding. Napoli does not cite any precedent to support the existence of such a hearing, save for the text of 18 U.S.C. § 3504. This statute, however, does not provide the relief that Napoli seeks.

Section 3504 provides that if any party claims that evidence is inadmissible because it was the product of an unlawful act, including unlawful use of a wiretap, the opponent of the claim must confirm or deny the occurrence of the unlawful act. Congress passed § 3504 out of recognition that it can be difficult for defendants to prove that they have standing to challenge evidence discovered due to previous, unlawful electronic surveillance. *See United States v. Williams*, 580 F.2d 578, 583 (D.C. Cir. 1978). Pursuant to § 3504, if defendants claim that evidence against them was acquired as a result of prior, unlawful surveillance, the Government must confirm or deny whether that

41

unlawful surveillance occurred. *Id.* Napoli interprets the Government's statutory obligation to confirm or deny the existence of the unlawful surveillance as to mandate a necessity hearing. This interpretation, however, is completely divorced from a plain reading of the text. Nothing in the text indicates that defendants are entitled to a hearing if they allege that the Government illegally searched them by electronic means. We are not persuaded that Napoli is entitled to a necessity hearing under this statute, and are not inclined to create new precedent on this issue. We are also not inclined to accept Napoli's invitation to deem *Franks* inapplicable to challenges to wiretap applications based on necessity. Though we need not determine whether a *Franks* hearing is appropriate when parties make a necessity challenge to a wiretap affidavit, based on the weight of extra-circuit authority, it would be inappropriate and mere dicta to rule it out at this time. *See Green*, 175 F.3d at 828; *Guerra-Marez*, 928 F.2d at 670; *Cole*, 807 F.2d at 267-68; *Ippolito*, 774 F.2d at 1484.

2.

Napoli and Johnson contend that the District Court committed legal error because it analyzed whether the wiretap affidavits established necessity under probable cause, rather than Title III, principles. Specifically, Johnson and Napoli assert that the District Court erred because it relied on the "good faith exception" set out in *United States v. Leon*, 468 U.S. 897 (1984), when determining the wiretap affidavits established legal necessity. They base this assertion on the District Court's statement at the suppression hearing that

42

"[n]ow, so I will then, of course, I will review the affidavits to determine whether the *Leon* standard has been met. And I will do so not only for a probable cause but also for necessity with respect to the wiretaps." (R. at 251A.) This statement, admittedly, seems to support their argument.

It is clear from the record, however, that regardless of what the District Court said at the suppression hearing, it did not apply the good faith exception in its ruling. When ruling on Defendants' various motions to suppress, the District Court first determined that the affidavits supported probable cause and noted "[t]he determination of a judicial officer that an affidavit establishes probable cause deserves great deference." (R. at 277A (citing *Leon*, 468 U.S. at 915).) Then, the District turned to the question of whether the affidavits established necessity to conduct the wiretaps. The District Court set forth appropriate legal standards and stated that the affidavits "describe the inability of normal police surveillance techniques to uncover the complex web of relationships between members of the Breed motorcycle organization. . . . We find that the statements and the affidavits of Agent Schwartz were sufficient to establish the inadequacy of normal investigative procedures, thus necessitating the use of wiretaps." (R. at 280A-281A.) There were two pages between the District Court's cite to *Leon* and its ruling on necessity. We find that the record makes clear that the District Court did not rely on the good faith exception announced in *Leon* when handing down its necessity finding, and

43

did not use any language suggesting it applied the good faith exception. We are

persuaded the court did not apply the *Leon* test to its necessity analysis.[21]

3.

Napoli and Johnson "submit[] that the government failed to make a facial showing,

within the four corners of the affidavits, to establish necessity for the Johnson 1, Johnson

2, and Napoli" wiretaps. (Napoli Br. 35; Johnson Br. 19-32.)[22] Pursuant to this

challenge, Defendants raise two issues: (1) whether the application contained boilerplate

recitations about the limitations of certain normative investigative techniques, and (2)

whether the affidavits misrepresented the success law enforcement had when using

---

[21] Notably, it is not clear that relying on *Leon* when assessing necessity amounts to legal error. In *Leon*, the Supreme Court held that the exclusionary rule should not be applied to bar the use of evidence obtained pursuant to an invalid warrant if the officers had an objective, reasonable belief that the warrant was valid. 468 U.S. at 922. This modification to the exclusionary rule applies to Supreme Court's Fourth Amendment jurisprudence. Because the exclusionary rule is a judicial remedy, it is within the judiciary's province to determine when it applies. We have never addressed whether *Leon*'s good faith exception applies to wiretaps, but other circuits are split on this issue. *Compare United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994), *United States v. Malekzadesh*, 855 F.2d 1492, 1497 (11th Cir. 1988), *and United States v. Vest*, 842 F.2d 1319, 1334 (1st Cir. 1988); *with United States v. Rice*, 478 F.3d 704, 711-12 (6th Cir. 2007). We need not decide today whether *Leon* applies to necessity because the District Court did not rely on it.

[22] Defendants' facial argument is intertwined with their non-facial challenges. For example, when explaining why the wiretap affidavits' statements of necessity are facially insufficient, Napoli and Johnson allege that the affidavits contain false statements and omissions by comparing the affidavits to other documents. Relying on outside evidence to establish an argument is the definition of a non-facial argument. Further, we have already considered and disposed of the non-facial arguments. Here, we consider only whether the wiretap affidavits establish necessity on their face.

44

normal investigative techniques when discussing the need for wiretap surveillance. We exercise de novo review to determine whether the application contained the requisite statement of necessity, and if we determine such a statement is present, we review the court's determination of necessity for abuse of discretion. *Phillips*, 959 F.2d at 1189.

When applying for a wiretap, the affiant must provide a full and complete statement of why an affidavit is necessary. 18 U.S.C. § 2518 (1)(c). The Government does not have a "great" burden in proving necessity, because it "need not prove to a certainty that normal investigative techniques will not succeed, but rather it needs only to show that such techniques reasonably appear to be unlikely to succeed if tried." *Armocida*, 515 F.2d at 38. The affidavit need only establish a "factual predicate" for why other investigative techniques are not sufficient. *McGlory*, 968 F.2d at 345 (quoting *Armocida*, 515 F.2d at 38).

That said, we have acknowledged that applications which use "general declarations and conclusory statements" or "'boiler plate' [statements] and the absence of particulars" do not meet the full and complete statement requirement. *Vento*, 533 F.2d at 849-50. Such generalized wiretap applications must be denied to prevent wiretapping from becoming a "routine investigative recourse." *Id.* at 850. In facial determinations, the issuing court should take into account affirmations based on the specialized training and experience of law enforcement officers. *Armocida*, 515 F.2d at 38.

Defendants' first argument, that the application contained boilerplate recitations about the limitations of certain investigative techniques, goes to whether the affiant made a full and complete statement of necessity. *See United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001). The District Court found that the affidavits did contain a statement "sufficient to establish the inadequacy of normal investigative procedures, thus necessitating the use of wiretaps." (R. at 280A-281A.)

Defendants complain that the affidavits do not have full and complete statements of necessity because the affidavits rely on boilerplate recitations and "conclusory language [or] circumstances" about the limitations of pen registers and trap and trace devices that apply to problems in investigating with certain tools in every case. (Napoli Br. 44.) Defendants point to language in all three affidavits that "analysis of data derived from telephone toll records, cellular call details, subscriber information, pen register and trap and trace devices, etc. is of limited use because it only provides the telephone numbers and subscriber information of telephones." (R. at 911A, 988A, 1072A.) They characterize these statements as conclusory.

A plain reading of the affidavits reveals that the affiant offered a detailed description of why the inherent limitations of pen registers, tracing devices, and similar investigatory tools would be insufficient in *this* case. The affiant explains that these tools would be insufficient to aid law enforcement in obtaining the information it needed, specifically, the location of co-conspirators, information about the Breed's source, or how

46

deliveries occur, in order to prosecute these individuals. This sort of detail is precisely what Title III requires. *See Vento*, 533 F.2d at 849-50 (noting boilerplate statements which lack particulars are insufficient for a full and complete statement, implying that the statement is full if officers include particulars).

Defendants similarly complain that the affidavits contain boilerplate language regarding the futility of using search warrants and video surveillance. Again, a plain reading of the record reveals that the affiant explained thoroughly why the use of search warrants would potentially compromise this entire case by tipping off the suspects to the investigation before sufficient evidence was collected. He also explained why video surveillance is insufficient in this investigation, by referencing where law enforcement would likely engage in physical surveillance and detailed why that would not render sufficient evidence. Thus, we agree with the Government that a plain reading of the affidavits belies Defendants' claims that the affidavits did not contain a full and complete statement of necessity.

Napoli also argues that the affidavits are facially insufficient to establish necessity because the normal investigative tools used, including surveillance, informants, and pen registers, had been "extremely successful." (Napoli Br. 40.) Therefore, he contends that the affidavits do not actually establish it was necessary to use a wiretap because law enforcement could have used more extensive surveillance instead. Napoli's question

relates to whether these wiretap affidavits establish necessity, and we review a District Court's finding on this matter for abuse of discretion. *Phillips*, 959 F.2d at 1189.

Napoli elaborates that law enforcement had great success conducting physical surveillance because it observed meetings between individual Breed members and informants and performed controlled purchases. Napoli contends that evidence of these successful surveillance opportunities contradicts the affiant's claim that it is hard to physically survey Breed members because they are "extremely aware of their surroundings." (R. at 908A, 984A, 1067A.) The fact that law enforcement had some success using physical surveillance does not render a wiretap per se unnecessary. The affiant contended that physical surveillance is somewhat dangerous because Breed members are aware of their surroundings and Breed members practice counter-surveillance measures. Therefore, the affiant explains that it is likely the Breed is able to identify undercover vehicles used for surveillance. We do not require law enforcement to prove that a certain investigative approach is useless to pursue a wiretap; it is only obligated to give a full explanation as to why a technique is "impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues." *Vento*, 533 F.2d at 849. The affiant's explanation for why physical surveillance alone is impractical to investigate the Breed, due to the Breed members' specific characteristics, is sufficient to meet that obligation. Therefore, the District Court did not abuse its discretion by finding necessity on these facts.

Similarly, Johnson points out that law enforcement successfully conducted extensive physical surveillance after the wiretap was granted and quips that Breed members became unaware of their surroundings after the wiretap was in place. Evidence that law enforcement was more successful with physical surveillance after the wiretaps were installed does not necessarily suggest that the affiant misrepresented law enforcement's ability to obtain sufficient evidence with surveillance alone – wiretap interceptions may have facilitated more effective physical surveillance. Therefore, the District Court did not abuse its discretion by finding necessity despite evidence that law enforcement did have some success with physical surveillance, particularly after the wiretaps were installed.

Napoli also explains that law enforcement had success using pen registers and toll records because, by documenting calls from Napoli's and Johnson's phones, they were able to learn the identities of who they were calling. (Napoli Reply Br. 4.) He suggests that had law enforcement followed all the leads it found on these lines, it would have discovered "critical information." (*Id.* at 5.) The Government affidavit need only establish a "factual predicate" for why an investigative technique is not sufficient. *See McGlory*, 968 F.2d at 345. The affiant explained in detail that use of pen registers and toll devices had limited utility, in this investigation, because it would not permit access to the content of the calls, which was paramount for success. (R. at 911A.) Because the

affiant laid a factual predicate about why use of pen registers and related devices was unlikely to succeed, the District Court did not abuse its discretion by finding necessity.

Johnson also offers a slightly different boilerplate argument in his Opening and Reply Briefs – that the wiretap affidavits contain boilerplate statements because they contain language copied from a wiretap affidavit submitted in a previous investigation. As proof, Johnson invites us to compare the affidavits subject to this appeal to the prior wiretap affidavit. We will decline such an invitation because Johnson never presented this argument to the District Court.[23]

---

[23] Johnson did not argue or present any evidence to the District Court suggesting that the wiretap affidavits did not contain a full and complete statement because they copied statements from a wiretap affidavit in a previous case. Instead, Johnson offers this argument and the prior wiretap affidavit for the first time on appeal. "Generally barring exceptional circumstances, like an intervening change in the law or the lack of representation by an attorney, this Court does not review issues raised for the first time at the appellate level." *Gleason*, 243 F.3d at 142. Because Johnson raised this argument for the first time on appeal, and the District Court had no opportunity to consider this argument, it is waived.

Johnson offers three arguments that this issue was raised to the court below, none of which are persuasive: (1) he alleges that Defendants alluded to this issue below; (2) he alleges the prior wiretap affidavit is incorporated by reference into the record; and (3) he implies that review is not precluded based on *United States v. Gonzales*, 927 F.2d 139, 144 (3d Cir. 1991).

Johnson asserts that Defendants alluded to Agent Schwartz's comments made in the previous wiretap affidavit before the District Court. He points first to Napoli's attorney's statement that "the agent brings in information of circumstances and facts which have absolutely nothing to do with Napoli or any of these individuals." (R. at 104A.) Johnson contends this statement suggests that Defendants have evidence indicating the affiant made statements unrelated to any Breed members in the wiretap affidavits. Nothing about this statement, however, suggests that the affiant copied language from another wiretap affidavit and incorporated it into the wiretap affidavits

50

subject to the Breed investigation. Therefore, it would be inappropriate to construe this statement as raising a claim that the affiant used copied language in this affidavit. Johnson also points to argument at trial where counsel chastised the Government for not providing Defendants' attorneys with copies of exhibits. This conversation, however, related to the Government failing to have a copy of a search warrant for Defendants at the suppression hearing; it did not relate in anyway to evidence of prior wiretap affidavits or the lack thereof. Therefore, this statement in no way suggests that the affiant copied language from another affidavit.

Johnson also relies on the Government's failure to produce the search warrant to suggest that it failed to produce Agent Schwartz's past wiretap affidavits, despite many requests. However, this comment refers to the Government's failure to have a copy of a search warrant, and in no way establishes that the Government failed to produce the document at issue. Moreover, after a review of Defendants' various motions to compel, there is no indication that any of them repeatedly requested production of prior wiretap affidavits penned by Agent Schwartz. Thus, Johnson has not persuaded us that Defendants alluded to this claim below.

Similarly, Johnson argues that the prior wiretap affidavit was not improperly inserted into the record by claiming it became part of the "scope of the record" due to the fact Agent Schwartz and the Government repeatedly reference it in the record. Although Agent Schwartz discussed the Warlock investigation in the wiretap affidavits filed in this case, he never referenced the wiretap affidavits filed in the Warlock investigation, and the Government never incorporated those affidavits by reference. Moreover the record on appeal is limited to the "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." Fed. R. Civ. P. 10(a). Because the prior wiretap affidavit was not included in these documents, it is not part of the appellate record. Instead, it was improperly included in the record submitted to this Court.

Johnson also asserts that we are not precluded from considering this argument because it is a due process claim not raised prior to trial because the evidence material to the motion was not available until after trial. He cites *Gonzales*, 927 F.2d 139 (3d Cir. 1991), for this proposition. This case, however, is not on point. In *Gonzales*, we considered whether a defendant should be completely barred from raising a claim that could defeat prosecution because the claim was not raised prior to trial. *Id.* at 143. We determined that it was unfair to completely bar a due process claim that should have been

4.

Napoli additionally argues that the District Court erred by not granting his motion to suppress the wiretap affidavits for failing to comport with the necessity requirement because (1) the court did not independently assess whether necessity was established in each affidavit, and (2) law enforcement did not conduct an independent investigation to establish necessity to tap Napoli's phone.

Napoli asserts that the District Court did not distinguish between any of the wiretap applications when it found necessity and summarily denied Defendants' motions to suppress evidence from each individual application. During the court's ruling, it determined that all three wiretap affidavits established necessity at the same time:

> "In this case, the affidavits of Agent Schwartz discussed at length the reasons why other law enforcement techniques would be ineffective or even counterproductive in this case. In particular, the affidavits describe the inability of normal police surveillance techniques to uncover the complex web of relationships between members of the Breed motorcycle organization. The affidavits noted that the Breed organization was very secretive and worked

<hr/>

raised in a Federal Rule of Criminal Procedure 12(b) motion, but was not raised because the information necessary to the motion was not available to defendants until the eve of trial. *Id.* at 144. Instead, we agreed to review the belated claim for plain error. *Id.*

In the case at hand, Johnson did not fail to raise a Rule 12(b) motion, therefore *Gonzales* is not on point. Rather, Johnson failed to raise the argument that the wiretap affidavit contained an incomplete statement because it contained boilerplate statements from an affidavit in another investigation. This is a new issue first raised on appeal. Therefore, it is waived. *Gleason*, 243 F.3d at 142.

Finally, Johnson accuses Judge Panella of improperly rubber stamping wiretap applications without sufficiently assessing whether necessity was established. Because this argument was raised for the first time in his Reply Brief, it is waived. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).

52

hard to keep its drug distribution activities clandestine. Although the confidential informant was able to provide some information, he or she was not privy to confidential club business. Such tactics as executing search warrants or initiating a grand jury investigation would likely alert the targets. We find that the statements and the affidavits of Agent Schwartz were sufficient to establish the inadequacy of normal investigative procedures, thus necessitating the use of the wiretaps."

(R. at 280A-281A.) Napoli interprets this joint ruling as indicating that the District Court did not individually assess each wiretap affidavit. This interpretation is contradicted by the record. Prior to stating its conclusion, the court said that "[e]ach wiretap application must independently satisfy th[e] necessity requirement." (R. at 280A.) Therefore, although the District Court issued one ruling for all three affidavits, perhaps in the interest of judicial efficiency, the record does not indicate that the court shirked its responsibility to independently analyze each wiretap affidavit for necessity. 18 U.S.C. § 2518(1) (specifying that "each" application must contain a showing of necessity).

Napoli complains that the wiretap affidavit for his phone did not establish necessity because law enforcement did not conduct any new or independent investigation with respect to Napoli. Notably, the wiretap affidavits for Johnson's second phone and Napoli's phone are virtually the same. Napoli asserts that the vast similarity demonstrates that law enforcement "relied solely upon the investigation that had been completed to date with respect to Johnson" to establish necessity to electronically survey Napoli. (Napoli Br. 49.) Napoli's argument misses the mark. He suggests that the investigation of Johnson and Napoli were distinct, by suggesting that the investigation of Johnson was

53

somehow not an investigation of him as well, but this is not the case. The wiretap applications make clear that law enforcement investigated Johnson, Napoli, and many other Breed members as part of a larger investigation of a drug conspiracy. (R. at 1061A (indicating affiant was investigating the crystal methamphetamine trafficking activities controlled by Napoli, with "a very close circle of confederates," including Johnson).) Therefore, we hold that the District Court did not abuse its discretion when it found that the wiretap application for Napoli's phone established necessity, even though much of the evidence referenced to establish necessity was also referenced in the wiretap application for Johnson's second phone.

## B. Searches

Johnson and Heilman assert that the District Court erred by failing to suppress physical evidence obtained during police searches of their residences; they claim these searches violated their Fourth Amendment rights. The Government contends that the District Court did not err by admitting evidence discovered during these searches.

We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings, and exercise plenary review over the court's application of the law to the facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). Suppression issues raised for the first time on appeal are waived, absent good cause. *United States v. Rose*, 538 F.3d 175, 177, 182 (3d Cir. 2008). This bar applies not only where a defendant failed to file a suppression motion before the district court, "but also

where [the defendant] filed one but did not include the issues raised on appeal." *Id.* We find that the District Court did not err by admitting evidence discovered during these searches.

1.

Johnson asserts that the District Court erred in failing to suppress the physical evidence obtained from his two residences, 3632 Morrell Street and 4648 Bergen Street, because both warrants violated the particularity requirement of the Fourth Amendment. He contends: (1) the search warrant was facially over broad because it did not place any "meaningful limitations on the agent's seizure," (Johnson Br. 37); (2) the warrant was so over broad it cannot be cured by the "good faith exception," (*id.* at 38); and (3) the Government seized items outside the scope of the search warrant, in violation of the Fourth Amendment. Johnson also argues that he suffered from constitutionally infirm searches because the agents failed to leave copies of the warrants and property receipts at the places of the searches. We will affirm the District Court's denial of Johnson's motions to suppress.

Johnson waived his claims of overbreadth and seizure outside the scope of the search warrant. In his preliminary suppression motions before the District Court, Johnson raised two arguments: (1) that the search warrants lacked probable cause because they were based on illegally obtained wire intercepts, and (2) that law enforcement failed to follow procedural requirements relating to the search by (a) forcing entry into the two

55

residences by failing to give proper notice and reason for admittance, (b) by refusing to display warrants to occupants, and (c) by failing to leave a copy of the warrant, affidavit, sealing orders, or inventory. (R. at 764A-765A.) Johnson echoed this inquiry through oral argument in court, arguing that the executing officers failed to leave a copies of the requisite paperwork at the residences. (R. at 121A, 215A.) Although Johnson filed a motion to suppress, because he did not argue that the search warrants were over broad or that the Government seized items outside the scope of the search warrant before the District Court, these claims are waived on appeal. *See Rose,* 538 F.3d at 182. Johnson has not argued any cause, let alone "good cause," for not raising these arguments before the District Court. Therefore, he waived these claims.

Johnson clearly raised his complaint that the executing officers failed to leave copies of the search warrants and property receipts at the time of the searches before the District Court and on appeal. (R. at 121A, 215A, 764A-765A; Johnson's Br. 43.) The District Court concluded that "[a]t both the Bergen Street and Morrell Street residences, the officers left a copy of the face sheet of the sealed warrant and a copy of the receipt inventory." (R. at 285A.) Because this raises a factual question, we will reverse only if the District Court's finding was clearly erroneous. *See Perez*, 280 F.3d at 336. The District Court's finding is not clearly erroneous in this case.

Johnson did not offer any evidence other than his own allegation that law enforcement failed to leave the necessary documentation at the time of the searches. The

Government offered the testimony of Agents Schwartz and Asher at the preliminary hearing to establish that the executing officers left the face covers of the sealed warrants and copies of the inventory lists at the scenes. Agent Schwartz testified that he prepared the search warrant for Bergen Street, but that the warrant and affidavit were under seal, except for the cover sheet. (R. at 215A-217A.) The executing officer told him, however, that he left a copy of the receipt inventory and the face sheet of the warrant on the table in the living room area at the conclusion of the search. (R. at 218A-219A.) Agent Schwartz also testified that law enforcement intercepted a call made to Napoli's phone that morning during which Stacy Johnson told Napoli that "I have a paper of the stuff." (R. at 220A.) Stacy Johnson, Johnson's wife, was present during the search of the Bergen Street residence. (R. at 218A-219A, 1274A.) Based on the Agent's testimony that the executing officers left the appropriate documentation after the search, corroborated by the intercepted call, we do not find that the District Court committed clear error.

Agent Asher testified that he prepared the inventory sheet for the Morrell Street search at the residence, and per Johnson's instructions, left it on the dining room table. (R. at 199A-200A.) He said he composed a rough inventory sheet, and then a more polished one, during the search of Morrell Street. (R. at 199A.) When leaving the face sheet and inventory list, he accidentally left all the copies. Law enforcement intercepted a call between Charles Kulow ("Kulow") and Napoli after the search of the Morrell Street property. (R. at 132A.) During the call, Kulow confirmed that the executing officers left

a receipt for the inventory. (R. at 132A.) Again, based on the Agent's testimony that the executing officers left the appropriate documentation after the search, corroborated by the intercepted call, we cannot find that the District Court committed clear error.[24]

2.

Heilman asserts on appeal, and in a preliminary motion before the District Court, that law enforcement's search of his residence at 813 Pine Street was constitutionally infirm because the search warrant did not establish probable cause. The District Court denied Heilman's motion to suppress, finding that the warrant affidavit was "thorough and complete and was based on wiretap evidence . . . as well as surveillance, reliable information from named sources, and a cooperating informant, . . . and a controlled methamphetamine purchase from defendant Heilman at his home." (R. at 282A.) The Government characterizes Heilman's argument as remarkable considering the evidence of criminal activity alleged against him, and as "wholly unpersuasive." (Gov't Br. 132.) We agree with the Government.

To find probable cause, there must be a "fair probability that contraband or evidence of a crime will be in a particular place" based on the totality of the circumstances. *United States v. Bond,* 581 F.3d 128, 139 (3d Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause can be, and often is, inferred by

---

[24]    Both agents' testimony included hearsay statements of other declarants. Although hearsay evidence is normally inadmissible, courts are permitted to rely on hearsay evidence in suppression hearings. *United States v. Raddatz*, 447 U.S. 667, 679 (1980).

considering the type of crime, the nature of the items sought, and the suspect's opportunity to conceal them. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). As such, "direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant." *Id.* (quoting *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993)). It is not our role to make our own assessment as to whether probable cause existed; rather, we must determine if the reviewing judge had a sufficient basis to find probable cause. *See Hodge*, 246 F.3d at 305; *United States v. Jones*, 994 F.2d 1051, 1057 (3d Cir. 1993). This deference does not counsel us to "rubber stamp" the issuing judge's conclusions, but does counsel that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Jones*, 944 F.2d at 1055 (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Heilman admits that the affiant presented substantial information against him in the affidavit in support of the search warrant, and the affidavit in support of electronic surveillance of Napoli, which was attached to the affidavit of probable cause. This information includes: (1) an historical investigation identifying Heilman as a methamphetamine seller; (2) Grady characterized Heilman as a "pound seller" for Napoli; (3) a call-detail analysis indicating Heilman and Napoli shared sixty-eight calls prior to May 2006, (R. at 1060A); (4) a call-detail analysis indicating that there were seventy-four calls between Heilman and Johnson between February 8, 2006 and April 17, 2006; and

59

(5) Serviolo purchased three and one-half grams of crystal methamphetamine in a controlled buy at Heilman's residence on June 3, 2006, (R. at 1281A-1282A). Nevertheless, Heilman contends this evidence is insufficient to support a "fair probability" that contraband evidence would be found in his house. (Heilman Br. 18-19.)

Heilman complains that with the exception of the controlled purchase, every conclusion set forth by the affiant is without factual support, and suggests a magistrate judge is not permitted to consider an expert's opinions in finding probable cause unless they are supported by facts. (Heilman Br. 19 (citing *United States v. Loy*, 191 F.3d 360 (1999)).)[25] This statement is incorrect because, at a minimum, the call logs provide evidentiary support that Heilman was in frequent contact with both Napoli and Johnson. But even if we discount all the evidence except for the call logs and the controlled purchase, a magistrate would still have a sufficient basis under which to find probable cause. *See Hodge*, 246 F.3d at 305. The fact someone purchased drugs at Heilman's house three days prior to the search and that Heilman is in frequent contact with drug distributors creates a fair probability that drugs or drug-related paraphernalia would be found on his property. *Id*.

Heilman also complains that probable cause cannot rest on the controlled purchase on June 3, 2006 because the magistrate judge was not provided with any information regarding the trustworthiness of the tipster. Information about a tipster's reliability is a

---

[25] Heilman does not indicate where or how *Loy* supports his argument.

relevant factor in probable cause determinations. *See Gates*, 462 U.S. at 230; *United States v. Williams*, 3 F.3d 69, 72 (3d Cir. 1993). A confidential informant's tip cannot support a finding of probable cause if the warrant affidavit lacks any information about his or her reliability. *United States v. Stearn*, 548 F. Supp. 2d 182, 189 (E.D. Pa. 2008). Although the affidavit here lacks significant discussion about Serviolo's reliability, that fact alone does not compromise the District Court's finding of probable cause. The warrant affidavit relied on the CI's participation in a controlled buy to establish probable cause, not on a tip from the CI. Controlled purchases by informants are distinct from informants' tips – purchases in fact can be the sort of reliable indicia that corroborates a tip. *See United States v. Khounsavanah*, 113 F.3d 279, 286 (1st Cir. 1997) (noting that an informant's controlled purchase corroborated his tip that people at that address were selling drugs); *see also United States v. Burton*, 288 F.3d 91, 98-99 (3d Cir. 2002) (listing informant's purchase of cocaine as a factor that corroborated informant's tip that a large drug deal was occurring, and to support law enforcement's inference that a large drug deal was taking place). Because the court relied on the controlled purchase engaged in by the CI, rather than any information from the CI, to find probable cause, Heilman's concerns about the CI's reliability are irrelevant.

Heilman also contends that probable cause is lacking because the warrant affidavit contained "no information suggesting that Heilman distributed [m]ethamphetamine for the Breed." (Heilman Br. 20.) Heilman's affiliation with the Breed specifically is largely

61

irrelevant and unnecessary to an inquiry into probable cause for a search, because probable cause focuses on the location of a crime, not the affiliations of the criminals.

We find that the District Court did not err in finding that the magistrate judge had a substantial basis upon which to find probable cause to search Heilman's residence. *See Bond,* 581 F.3d at 139. It is clear that a reasonable judge could determine it was fairly probable that criminal evidence would be found in Heilman's residence. *See id.*

### C. Jencks

Napoli claims the Government violated his Fifth and Sixth Amendment rights by failing to provide Defendants with the prior statements of agents who testified at the suppression hearing, immediately after that hearing. Napoli specifies that the Government failed to provide Defendants with (1) the prior testimony of Agent Schwartz before both the Pennsylvania grand jury and the federal grand jury, and (2) Agent Schwartz's prior written statements and memorandum regarding Serviolo. Napoli's factual and legal assertions differ in his Opening and Reply Briefs. For simplicity, we will state the factual circumstances surrounding these claims and then address the arguments in turn.

Napoli's attorney submitted a motion to compel on August 8, 2007. (R. at 808A.) In the motion, Napoli specifically requested documents that detail the activities of confidential sources and grand jury minutes or documents related to plea agreements entered into by individuals who will testify for the Government. (R. at 806A.) It is clear

that this request encompasses the documents which Napoli claims he did not receive –

Agent Schwartz's grand jury testimony and the memorandum related to Serviolo. (R. at

806A.) Napoli's attorney, however, stated in open court on September 5, 2007 that the

request to compel evidence was "mooted by the production by the prosecution or

identification by the prosecution of several documents." (R.. at 98A.) Napoli's attorney

further stated that he had not physically seen "certain documents," but attributed that to

"inefficiencies on this side of the table," rather than the prosecution's failure to produce.

(R. at 98A-99A.) Later that same day, Napoli's attorney indicated he was still missing

some evidence from the prosecution. (R. at 254A-255A.) The Government admitted that

it had not yet turned over Jencks materials, i.e. prior testimony and statements of

testifying witnesses, but stated that the "Jenks [sic] and Giglio material would be

provided pursuant to the court order as of Friday," September 7, 2007. (R. at 255A; *see*

R. at 100A-101A.)

The Government repeatedly stated that the prior statements of testifying witnesses

would be turned over on Friday, September 7, 2007. That date is noteworthy because

both parties were aware that the motion to suppress hearing would be held on September

5 and 6. When the Government repeatedly indicated that the requested materials would

be turned over on Friday, none of the Defendants objected, suggesting that they implicitly

agreed to the production of these materials after the suppression hearing. (R. at 100A-

101A, 254A-255A.) On September 10, 2007, Napoli filed a motion to join his co-

defendants' pre-trial motions, which included Johnson's pre-trial motion to compel Jencks evidence.

In his Opening Brief, Napoli argues that the Government's failure to disclose this information violated Federal Rules of Criminal Procedure 12(h) and 26.2. Napoli conceded that his attorney did not object to the Government's failure to disclose this evidence after the suppression hearing, but contends that this issue can still be considered on appeal because failure to make such an objection is plain error or, in the alternative, amounts to ineffective assistance of counsel. The Government contends that Napoli's claim is without merit because Napoli failed to move for such evidence and there are no grounds for either plain error review or ineffective assistance on these facts.

Although Napoli never identified the missing materials as Jencks materials, the Government characterized them this way because Napoli asserted the failure to disclose violated Federal Rule of Criminal Procedure 26.2. The Jencks Act provides:

> "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which related to the subject matter as to which the witness has testified."

18 U.S.C. § 3500(b).

Rule 26.2 and the Jencks Act are virtually identical.[26] Rule 26.2 was intended to replace provisions of the Jencks Act dealing with the discovery of prior statements of testifying witnesses on "the notion that provisions which are purely procedural in nature should appear in the Federal Rules of Criminal Procedure rather than in Title 18." *United States v. Smith*, 31 F.3d 1294, 1302 n.6 (4th Cir. 1994) (quoting Fed. R. Crim. P. 26.2 advisory committee's note). Congress has never repealed the Jencks Act, however, and courts and litigants rely on both the Act and Rule 26.2 when dealing with defense motions for production of prior statements. *Id.* These provisions can be used interchangeably because Rule 26.2 incorporates the relevant provisions of the Jencks Act without any "substantive change"; therefore, issues analyzed under either rule would render the same result. *Id.* Accordingly, the Government appropriately understood Napoli's argument as a complaint that the Government did not turn over requested Jencks materials.

The Jencks Act and Rule 26.2 require the Government to disclose prior recorded statements of its witnesses after they testify. 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2; *United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001). Disclosure of such statements is mandatory if the defendant makes a timely motion. *United States v. Hill*, 976 F.2d 132, 140 (3d Cir. 1992). Rule 12(h) provides that "Rule 26.2 applies at a suppression hearing

---

[26] Rule 26.2 provides that "[a]fter a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Fed. R. Crim. P. 26.2.

65

under Rule 12(b)(3)(C). At a suppression hearing, a law enforcement officer is considered a government witness." Fed. R. Crim. P. 12(h). The purpose of the Jencks Act and Rule 26.2 is to permit a trial lawyer to have the materials necessary to impeach a witness. *See United States v. Rosa*, 891 F.2d 1074,1076-77 (3d Cir. 1989) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957)). Therefore, a defendant has a right to prior statements made by a Government witness, after he testifies, upon a motion to compel such information.

Napoli asserts that the Government failed to provide him the requested statements, but the Government contends that Napoli never moved to request these statements. Moreover, the Government asserts that Napoli never objected to the Government's failure to produce Jencks materials at the suppression hearing; therefore, this claim cannot be considered on appeal.

We agree with the Government that both the Jencks Act and Rule 26.2 only mandate that a defendant have access to these documents if they make an affirmative motion, and it is unclear if Napoli made that motion. 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2. Although Napoli's attorney moved to compel Jencks materials, he stated in open court that this motion was mooted two days before the suppression hearing. (R. at 98A-99A.) By indicating that the Government had satisfied his motion to compel, Napoli's attorney indicated that he was not requesting the then-undelivered Jencks materials.[27]

_____

[27] In his Reply Brief, Napoli contends that, by joining all the pre-trial motions of his co-defendants, he joined Johnson's pre-trial motion to compel all Jencks materials. This

66

Assuming that Napoli's attorney did make the requisite motion to compel Jencks materials, it is clear from the record, and Napoli concedes in his Opening Brief, that his attorney did not object to the Government's failure to turn over Jencks materials. Napoli contends that this default can nonetheless be considered on the grounds of "plain error" [8][2] or "ineffective assistance of counsel." (Napoli Br. 65-66.) The Government contends that Napoli cannot satisfy either legal theory. We agree with the Government.

"'No procedural principle is more familiar to this Court than that a . . . right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before the tribunal having jurisdiction to determine it.'" *Puckett v. United States*,

---

argument would render Napoli's statement mooting his motion to compel request irrelevant. Napoli, however, did not raise this argument in his Opening Brief. Under Federal Rule of Appellate Procedure 28(a)(3)(5) and the Third Circuit's Local Rules, appellants are required to set forth the issues raised on appeal and present argument supporting those issues in their opening briefs. *See Kost v. Kozakiewicz,* 1 F.3d 176, 182 (3d Cir. 1993) (citing *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1065 (3d Cir. 1991); Fed. R. App. P. 28; Third Circuit L.A.R. 28.1(a)). An issue or argument is waived if appellants raise the argument for the first time in their reply brief. *Id.*; *Pelullo*, 399 F.3d at 222. Because Napoli raised this argument for the first time in his Reply Brief, it is waived.

[28]   In his Reply Brief, Napoli asserts that the "Appellee incorrectly argues that the standard of review for this claim is plain error." (Napoli Reply Br. 29.) However, Napoli concedes in his Opening Brief that his attorney did not object to the government's failure to produce the required discovery. (Napoli Br. 65.) Napoli further asserts in his Opening Brief that he should not be precluded from raising this issue on appeal under the plain error standard. Because he did not present any argument suggesting plain error review was inappropriate in his Opening Brief, but rather asserted that plain error review should be applied, Napoli cannot initiate an argument in his Reply Brief suggesting that standard of review is improper. *See Kost,* 1 F.3d at 182. Therefore, we analyze his claim for plain error and will not entertain any other standard of review.

67

129 S. Ct. 1423, 1428 (2009) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)).

An appellate court's authority to remedy an unpreserved error is limited to encourage

timely objections. *Id.* An appellate court can consider an unpreserved claim, raised for

the first time on appeal, if the error is plain. *Id.* There has been plain error if four steps

are met:

> "First there must be an error or some defect—some sort of deviation from a legal rule –that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than the subject of reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in an ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error – discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings."

*Id.* at 1429 (quotation marks and citations omitted).

We find Napoli cannot meet the plain error threshold. Even assuming Napoli

could prove that there was an obvious deviation from the law, he cannot demonstrate that

his attorney's failure to object would have affected the outcome of the case. Napoli

contends that with the use of the Jencks materials he could have presented evidence that

there were misstatements and omissions in the wiretap affidavits that were critical to a

finding of necessity. As we have already discussed, none of the evidence presented in the

Jencks materials establishes the existence of any material false statements or omissions in the wiretap affidavits.[29]

Napoli alternatively argues that his attorney's failure to object to the Government's failure to produce the Jencks materials constitutes ineffective assistance of counsel in violation of his Sixth Amendment rights. This Court usually does not review ineffective assistance claims on direct appeal, but will make an exception "'[w]here the record is sufficient to allow determination of ineffective assistance of counsel.'" *United States v. Olfano*, 503 F.3d 240, 246 (3d Cir. 2007) (quoting *United States v. Hadley*, 923 F.2d 1079, 1083 (3d Cir. 1991)). Ineffective assistance of counsel exists if the defendant can establish (1) that the attorney performance was objectively unreasonable, and (2) that there is a reasonable probability that, but for the attorney's error, the result of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010). Napoli claims that the record is sufficient to allow a determination of ineffective assistance.

Napoli's claim comes up short, however, because he fails to make an adequate showing of prejudice. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

---

[29]    Much of the outside evidence that Defendants relied on to argue the wiretap affidavits contained false statements and omissions consisted of Agent Schwartz's grand jury testimony and his memorandum regarding Serviolo. This is the same evidence Defendants claim the Government failed to timely turn over.

prejudice, which we expect will often be so, that course should be followed."). Napoli contends that his attorney was ineffective because, by not objecting to the Government's failure to turn over Jencks materials, Napoli was denied the opportunity to establish that the wiretap affidavit did not establish necessity. We have found, however, that even had Napoli had the Jencks materials, he would not be able to negate the finding of necessity. Therefore, he cannot show prejudice.

In his Reply Brief, Napoli drastically changes his argument regarding the Government's failure to disclose Agent Schwartz's grand jury testimony and the memorandum regarding Serviolo. First, he characterizes the missing documents as both *Brady* and *Jencks* materials. Second, he argues that the only reason the court mooted Napoli's motion to compel was due to the Government's representation that it would produce all requested materials. He then alleges the Government deliberately decided to disclose these documents one day after the suppression hearing to prevent Defendants from successfully obtaining a *Franks* hearing.

Napoli's attempt to raise a *Brady* claim in his Reply Brief, by characterizing the materials as *Brady* documents, is waived.[30] In his Opening Brief, Napoli complained that the Government violated Rules 12(h) and 26.2 by failing to turn over prior statements of testifying witnesses that are "related to" the subject matter of the witnesses' testimony.

---

[30] Napoli would not prevail on a *Brady* claim even if it was not waived. The Government is only obligated to disclose evidence under *Brady* that is material, and as previously determined, these statements are not material to establishing that the wiretap affidavits contained materially false statements or omissions. *See Brady*, 373 U.S. at 87.

70

*See* Fed. R. Crim. P. 26.2; 18 U.S.C. § 3500(b). Complaining that the prosecution failed to turn over *Brady* materials is a different claim. In *Brady v. Maryland*, the Supreme Court held that a due process violation results if the prosecution withholds evidence favorable to the accused that is "material either to guilt or punishment." 373 U.S. 83, 87 (1963). The prosecution is "not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deny the defendant to a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). Evidence is considered favorable if it is exculpatory or impeaching. *Id.* at 676. The Government's failure to turn over evidence that would be helpful to impeachment during cross-examination only amounts to a constitutional violation "if it the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678. Therefore, by arguing these documents were *Brady* materials, Napoli contends, for the first time in his Reply Brief, that the Government failed to turn over documents "material" to his defense, rather than prior statements merely "related to" the witnesses' testimony. A party's argument is waived if it is raised for the first time in a reply brief. *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 192 (3d Cir. 2005). Therefore, Napoli's *Brady* argument is waived.

Napoli's contention that the Government deliberately withheld documents is concerning, but is not borne out by the facts in the record. The record clearly establishes that, on September 5, 2007, both parties recognized that the Government had not yet

71

produced Jencks materials. (R. at 100A-101A, 254A-255A.) That acknowledgment occurred *after* Napoli's attorney indicated that his motion to compel was mooted. (R. at 98A-99A.) Therefore, if Napoli had been operating under the misguided notion that the Government would turn over the Jencks materials prior to the suppression hearing when characterizing his motion to compel as moot, that notion was righted by the later discussions. Instead, both parties agreed that Jencks materials would be turned over by the Government the day after the hearing. (R. at 100A-101A.) Therefore, the record indicates the Government did not strategically withhold Jencks materials; rather, both parties agreed that this material would be disclosed after the suppression hearing.

### D. Heilman's Motion to Sever

Heilman argues that the District Court abused its discretion when it denied his motion for a separate trial from his co-defendants. He contends that his trial rights were prejudiced because (1) his co-defendants, Napoli and Johnson, were charged with violent conduct, whereas he was not; (2) the large quantity of evidence against his co-defendants compared to the minimal amount offered against him would lead to a "spillover effect" on the jury; and (3) the jury was not able to fairly decide credibility issues in light of the quantity of evidence proffered against his co-defendants.

The Government contends that the District Court did not abuse its discretion and Heilman failed to meet his burden of demonstrating clear and substantial prejudice. We agree with the Government and affirm the denial of Heilman's motion for severance.

72

The federal system prefers joint trials of defendants who are indicted together because joint trials promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005). Moreover, joint trials of defendants charged in a single conspiracy aid the fact-finder in determining the full extent of the conspiracy and prevent a tactical disadvantage to the Government from disclosure of its case. *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996). Therefore, the decision whether to sever co-defendants' trial rests in the sound discretion of district courts, and we review that decision for an abuse of discretion. *Lore*, 430 F.3d at 205. "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *United States v. Thompson-Riviere*, 561 F.3d 345, 348 (4th Cir. 2009) (quotation marks omitted); *cf. United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (defining abuse of discretion as reliance on clearly erroneous finding of fact or an erroneous legal conclusion).

But even if the court did abuse its discretion, reversal is not required unless Heilman meets his heavy burden of demonstrating that the denial of severance led to clear and substantial prejudice resulting in a manifestly unfair trial. *See United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001); *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir. 1985) ("The trial judge is in the best position to balance the possible prejudice to a

73

defendant against the concerns of judicial economy.  Therefore, an appellant must meet a particularly heavy burden to show that the trial court abused its discretion in denying a motion to sever.") (citations omitted).

"If the joinder of . . . defendants . . . for trial appears to prejudice a defendant . . ., the court may . . . sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  Rule 14(a) does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.  *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).  A district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would (1) compromise a specific trial right of the defendants, or (2) prevent the jury from making a reliable judgment regarding guilt or innocence.  *Id.* at 539.  Nonetheless, less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice.  *Id.* (approving instructions to compartmentalize evidence, placing burden on government, and to find guilt beyond a reasonable doubt).

In assessing whether the District Court abused its discretion, we consider the record as it existed when Heilman made his motion, as well as what trial developments were reasonably foreseeable.  *McGlory*, 968 F.2d at 340; *see United States v. Reyeros*, 537 F.3d 270, 286 n.22 (3d Cir. 2008) (asserting that question of whether court abused its discretion should be judged as of the time court ruled on motion to sever).

In his motion to sever, Heilman argued that the quantity of evidence was greater

against his co-defendants than against him, that he was less culpable, and his co-defendants were charged with violent conduct. Heilman asserted that the jury would not be able to compartmentalize the evidence and pointed to the nature of the evidence proffered by the Government, including documents, wiretaps, physical evidence, photographs, and witness testimony. He also pointed out that in a twelve-count indictment, he was charged in only one count, and that of the forty-two overt acts for the charged conspiracy, he was mentioned in only five. The District Court denied his motion because severance is not warranted just because the evidence against the co-defendants is more damaging and any risk could be cured with a proper limiting instruction.

We conclude that the District Court did not abuse its discretion. A defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than evidence against the moving party. *Lore*, 430 F.3d at 205. Rather, the proper inquiry is whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility. *Id.* Because courts presume that the jury follows courts' instructions, a proper instruction to consider the evidence against each co-defendant separately is often persuasive evidence that a refusal to sever did not prejudice the defendant. *See United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005). In this case, the District Court gave such an instruction, admonishing the jury to

> "give separate and individual consideration to the case of each defendant. When you do so, you should analyze what the evidence in the case shows with

75

respect to that defendant leaving out of consideration entirely any evidence submitted solely against other defendants. For each defendant, you must decide whether the government has proven that particular defendant guilty beyond a reasonable doubt and you must return a separate verdict for each defendant."

(R. at 460A-461A.)

Moreover, it is not sufficient to merely allege that severance would have improved chances for acquittal, and prejudice should not be found simply because all evidence adduced is not germane to all counts against each defendant. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991); *see Lore*, 430 F.3d at 205 (noting it is not problematic to have defendants in same case charged with different acts or offenses). "Neither a disparity in evidence, nor introducing evidence more damaging to one defendant than others entitles seemingly less culpable dependants to severance." *Eufrasio*, 935 F.2d at 568 (affirming denial of severance of murder conspiracy charge against co-defendant). Further, where defendants are charged as members of the same conspiracy, acts committed by one in furtherance of the conspiracy would be admissible against others, even in a separate trial. *See Hart*, 273 F.3d at 370; *see also McGlory*, 968 F.2d at 340 ("[T]he mere introduction of other crimes evidence against one defendant does not entitle a co-defendant to a separate trial.").

Despite Heilman's concerns that the quantity of evidence or the nature of allegations against his co-defendants could prejudice his trial rights and render his trial manifestly unfair, the violent conduct alleged against his co-conspirators would be

76

admissible against him in a separate trial. *See Hart*, 273 F.3d at 370; *Eufrasio*, 935 F.2d at 568-69 (noting common evidence admissible in separate trials anyway). Furthermore, the District Court gave proper limiting instructions to ensure the jury would compartmentalize the evidence, which we presume the jury followed. *E.g.*, *Zafiro*, 506 U.S. at 539; *Voigt*, 89 F.3d at 1096. Such a presumption is not necessary in this case, however, because the jury was able to consider the evidence separately when it found Heilman guilty of conspiracy for a lesser amount of methamphetamine than his co-defendants. Finally, Heilman's argument regarding credibility issues is nothing more than an argument that he had a better chance of acquittal in a separate trial, which is not sufficient to show clear and substantial prejudice.[31] *See Eufrasio*, 935 F.2d at 568.

Therefore, we conclude that Heilman did not meet his heavy burden and, consequently, the District Court did not abuse its discretion.

### E. Napoli's Arguments Regarding Counts II through V

#### 1. Joinder and 404(b)

Napoli asserts that he was prejudiced in his trial by joinder of Counts II through V (VICAR assaults and collection of credit by extortionate means), which he argues are unrelated to the drug conspiracy charges. The Government responds by arguing that,

---

[31] Heilman did not assert this argument to the District Court and, therefore, we would normally review it for plain error. *See Hart*, 273 F.3d at 369-70. We nonetheless conclude that there was no abuse of discretion.

first, Napoli waived this issue by failing to present it to the District Court and, second, joinder was proper and not prejudicial.

A defendant must file a motion alleging a defect in an indictment or a motion to sever charges before trial commences.[32]  *See* Fed. R. Crim. P. 12(b)(3)(B), (C); *see also United States v. Williams*, 711 F.2d 748, 750 (6th Cir. 1983) (asserting claim of improper joinder asserts error in indictment).  Failure to do so may constitute waiver of those objections.[33]  Fed. R. Crim. P. 12(e); *see United States v. Mann*, 161 F.3d 840, 861-62 (5th Cir. 1998) (failure to object to joinder waives issue on appeal); *Williams*, 711 F.2d at 750-51 (acknowledging agreement among courts and commentators that failure to raise misjoinder argument before trial waives issue on appeal); *United States v. Greenleaf*, 692 F.2d 182, 187 n.4 (7th Cir. 1982) (failure to raise misjoinder or severance arguments before trial constitutes waiver); *United States v. Ochs*, 595 F.2d 1247, 1260 n.11 (2d Cir. 1979) (defendant waived improper joinder argument by failing to challenge indictment under Rule 8(a)); *United States v. Green*, 561 F.2d 423, 426 (2d Cir. 1977) (failure to

---

[32]  Thus, counsel's misjoinder argument *after* trial in this case would not suffice.  It is not clear from the record, however, whether Napoli was asserting a misjoinder argument, or simply arguing that the evidence of a nexus to the conspiracy was inadequate to support a conviction.

[33]  Although Rule 12(b)(5) would permit a court to ignore waiver "[f]or good cause," we are not persuaded by Napoli's argument that the second superseding indictment was so vague as to preclude a misjoinder argument.  Napoli does not dispute that his counsel received relevant materials a month before trial.  We believe this would allow plenty of time for able counsel to deduce the evidence the Government intended to present on these charges and to file an appropriate motion for severance.

claim improper joinder of offenses or defendants before trial constitutes waiver).

Although the Third Circuit has not yet decided the issue of waiver, we need not do so today because Count II was properly joined, and there was no prejudicial error resulting from the joinder of Counts III through V.

Rule 8(a) provides: "The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."[34]  Fed. R. Crim. P. 8(a); *see United States v. Dominguez*, 226 F.3d 1235, 1238 (11th Cir. 2000) ("Rule 8 is broadly construed in favor of initial joinder.").  We review the joinder of offenses de novo.  *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003).  If an offense was improperly joined, we must perform harmless error analysis to determine if prejudice resulted.  *Id.*  Such an error is not reversible unless it has a substantial effect on the outcome of the proceedings.  *United*

---

[34]    We have asserted that Rule 8(a) dealing with joinder of offenses applies only to prosecutions involving a single defendant, and that in a multiple defendant case, the tests for joinder of offenses and defendants merge into Rule 8(b).  *Irizarry*, 341 F.3d at 287.  And although we have acknowledged that most courts have held that Rule 8(b) applies exclusively to issues of joinder of multiple defendants and Rule 8(a) only applies in cases of a single defendant charged with multiple offenses, we have suggested that Rule 8(a) may provide the proper standard for joinder of offenses against one defendant, even in cases with multiple defendants.  *Id.*

This issue is significant because although the standards of Rule 8(a) and 8(b) are similar, in that they both require a transactional nexus between offenses or defendants joined, Rule 8(a) is more permissive because it allows joinder when offenses are of the same or similar character, whereas Rule 8(b) does not.  *Id.* at 287 n.4 (citing *Eufrasio*, 935 F.2d at 570 & n.20).  Accordingly, if joinder satisfies Rule 8(b), it also satisfies Rule 8(a).

*States v. Jiminez*, 513 F.3d 62, 83 (3d Cir. 2008) (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). Courts have concluded that misjoinder is harmless where there is overwhelming evidence of guilt or the trial court issues a careful limiting instruction to the jury on the issue of possible prejudice resulting from joinder. *See, e.g.*, *United States v. Jones*, 530 F.3d 1292, 1299 (10th Cir. 2008); *United States v. Cody*, 498 F.3d 582, 587 (6th Cir. 2007).

Our inquiry into the propriety of joinder of offenses focuses on the face of the indictment, not the proof subsequently produced at trial. *Irizarry*, 341 F.3d at 287. But we may look beyond the face of the indictment in limited circumstances, e.g. where pre-trial documents clarify the factual connections between the counts. *See United States v. McGill*, 964 F.2d 222, 242 (3d Cir. 1992). We have found sufficient connections between offenses undertaken in furtherance of and in association with a charged enterprise or conspiracy. *Cf. Irizarry*, 341 F.3d at 289-90 (concluding same act or transaction requirement satisfied where indictment charged criminal acts either as predicates for racketeering or as acts undertaken in furtherance of commonly charged RICO enterprise); *Eufrasio*, 935 F.2d at 570-71 (finding proper the joinder of offenses which constituted a single series of related acts furthering the RICO enterprise and its purposes). In addition, counts are similar if they are "somewhat alike" or share "a general likeness," or otherwise have a sufficient logical connection and can be tried using the same evidence. *See United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008); *United States v. Graham*, 275 F.3d

490, 512 (6th Cir. 2001) ("[W]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate."). Moreover, offenses may be joined if they occurred within a relatively short period of time of each other and the evidence of each overlaps. *See United States v. Donaldson*, 978 F.2d 381, 391 (7th Cir. 1992).

Count I charged Napoli, among others, with conspiring to knowingly and intentionally distribute and to possess with intent to distribute methamphetamine. The second superseding indictment alleged that Napoli and others threatened and engaged in severe beatings and assaults to enforce discipline within the alleged conspiracy. The conspiracy charge specifically cites as an overt act an assault which is the subject of Count II of the indictment. Thus, joinder of Count II was proper as an offense in furtherance of the alleged conspiracy. The indictment, however, does not charge any of the acts constituting Counts III through V as overt acts in the alleged conspiracy, and does not assert that Count V furthered the drug conspiracy. It does, however, allege that the acts in Counts III and IV were committed in furtherance of the charged conspiracy. Nevertheless, we need not pass on the propriety of joinder of Counts III through V because we conclude that any misjoinder was harmless.

Any error in misjoinder was cured by the District Court's proper limiting instruction to the jury:

> "The number of offenses charged is not evidence of guilt and this should not influence your decision in any way. Each count and the evidence pertaining

to it *must be considered separately*. The fact that you may find a defendant not guilty or guilty as to one of the offenses charged in the second superseding indictment should not control your verdict as to the other offenses charged in the second superseding indictment."

(R. at 460A) (emphasis added). We presume that the jury follows the court's instructions, which is evident in this case where the jury acquitted Napoli of Count III, one of the alleged VICAR offenses. *See Cody*, 498 F.3d at 588. Further, it is unlikely Napoli was prejudiced by the presentation of evidence for Counts III through V considering that Count II was properly joined and involved conduct significantly more violent than Counts III and V, and violence roughly equivalent to Count IV. Moreover, had Counts II through V been omitted from the indictment in this case, the District Court would not have abused its discretion in admitting evidence of the underlying conduct.[35]

Accordingly, we find that any error in joinder of these offenses was harmless and that Napoli suffered no prejudice.

---

[35] Napoli contends that the introduction of evidence related to Counts II through V violated Federal Rule of Evidence 404(b) because it was "admitted for the purpose of proving 'the character of a person in order to show action in conformity therewith.'" (Napoli Br. 62 (quoting Fed. R. Evid. 404(b)).) We review the District Court's decision to admit evidence for abuse of discretion. *United States v. Hoffecker*, 530 F.3d 137, 189 (3d Cir. 2008).

"Rule 404(b) does not apply to evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense. Acts are intrinsic when they directly prove the charged conspiracy." *Id.* (quotation marks and alterations omitted). Thus, even if Counts II through V had not been formally charged, evidence relating to them would nevertheless have been admissible as acts which directly prove the charged conspiracy. *See id.*; *United States v. Gibbs*, 190 F.3d 188, 218 (3d Cir. 1999) ("Since the government introduced evidence of Gibbs's use of violence to further the illegal objectives of the cocaine conspiracy . . ., the District Court did not abuse its discretion in permitting this evidence to come in.").

## 2.  Sufficiency and Jury Instructions

Napoli contends that the evidence was insufficient to support his two separate

convictions for violent crimes in aid of racketeering ("VICAR"), in violation of 18 U.S.C.

§ 1959(a)(3) (Counts II and IV),[36] and a conviction for collection of credit by extortionate

means, in violation of 18 U.S.C. § 894 (Count V).  The Government responds that it

presented sufficient evidence that Napoli participated in the assaults and extortion to

maintain his position in the Breed organization by violently disciplining its members.

When reviewing a jury verdict for sufficiency of evidence, we view the evidence

in the light most favorable to the Government and sustain the verdict if any rational trier

of fact could have found the essential elements beyond a reasonable doubt.[37] *See United*

*States v. Cunningham*, 517 F.3d 175, 177 (3d Cir. 2008).  We will examine the totality of

the evidence, both direct and circumstantial, and will credit all inferences in favor of the

Government.  *See United States v. Sparrow*, 371 F.3d 851, 852 (3d Cir. 2004).

### a.  VICAR – Counts II and IV

A violation of § 1959(a)[38] has five elements: (1) there was an enterprise, (2) that

---

[36]    The jury acquitted Napoli of a third charged violation of § 1959(a)(3) (Count III).

[37]    Napoli's counsel made Rule 29 motions for both the VICAR and the extortionate
credit counts.

[38]    Section 1959(a) provides, in relevant part:

"Whoever, . . . for the purpose of gaining entrance to or maintaining or
increasing position in an enterprise engaged in racketeering activity, . . .
assaults with a dangerous weapon, commits assault resulting in serious bodily
injury upon . . . any individual . . ., or attempts or conspires to do so, shall be
punished–

engaged in racketeering activity, (3) affecting interstate commerce, (4) and the defendant committed a crime of violence (5) for the purpose of gaining entrance to or increasing or maintaining his position in the enterprise. *United States v. Jones*, 566 F.3d 353, 363 (3d Cir. 2009). The Government must prove there is a nexus between the enterprise and the crime of violence and the defendant's relationship to the enterprise. *Id.* Napoli challenges only the proof of the motivation or purpose element of the crime.

Although § 1959 does not define the phrase "for the purpose of . . . maintaining or increasing position in an enterprise," courts have interpreted it according to its ordinary meaning. *See United States v. Farmer*, 583 F.3d 131, 141 (2d Cir. 2009); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994). As so defined, it encompasses violent crimes intended to preserve the defendant's position in the enterprise or to enhance his reputation and wealth within that enterprise. *Farmer*, 583 F.3d at 141. Moreover, Congress intended VICAR to complement RICO, and it intended VICAR, like RICO, to be liberally construed to effectuate its remedial purpose. *See United States v. Banks*, 514 F.3d 959, 967 (9th Cir. 2008).

Notably, the statute makes no reference to a sole, exclusive, or primary purpose. *Id.* at 968. Accordingly, self-promotion need not be the defendant's sole or primary

----

. . . .

      (3)    for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years . . . ."

18 U.S.C. § 1959(a).

concern if the violent act was committed as an integral aspect of membership in the enterprise. *See United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997), *reh'g on other grounds*, *United States v. Brown*, 161 F.3d 256, 257 n.1 (5th Cir. 1998) (en banc); *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) (citing *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)).  Nevertheless, VICAR requires more than an incidental purpose.  *See Banks*, 514 F.3d at 969 (rejecting jury instructions requiring only that jury find maintenance or enhancement of status was "one of" or "at least one of" defendant's purposes).  Thus, self-promotion need only be a general purpose for committing a violent crime.  *See id.* at 970; *United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998), *vacated on other grounds*, *Tse v. United States*, 290 F.3d 462 (1st Cir. 2002).

Contrary to Napoli's argument that the violence did not further the alleged drug trafficking, VICAR does not require a connection between the violent crime and the *purpose of* the enterprise; rather, the purpose of the violent crime must be related to the actor's *position in* the enterprise.  *Jones*, 566 F.3d at 363; *see Fiel*, 35 F.3d at 1005.  Further, the purpose element can be shown by evidence that the defendant committed the violent crime because he knew it was expected of him because of his membership in the enterprise or that he committed it in furtherance of such membership.  *See Farmer*, 583 F.3d at 142 (quoting *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001)); *United States v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006); *United States v. Smith*, 413 F.3d

85

1253, 1278 (10th Cir. 2005), *overruled on other grounds*, *United States v. Hutchinson*, 573 F.3d 1011 (10th Cir. 2009); *Tse*, 135 F.3d at 206; *Fiel*, 35 F.3d at 1004. Accordingly, evidence will be sufficient if it shows the defendant's general purpose was to maintain or enhance his position, or if the violent act was committed as an integral aspect of membership. *Banks*, 514 F.3d at 970.

Courts have found various types of evidence sufficient to meet the Government's burden. For instance, courts have considered testimony that violence is a common part of the culture, members are expected to retaliate, and members are pressured to live up to nicknames, *Smith*, 413 F.3d at 1278, as well as testimony that members are expected to violently respond to disrespect and to live up to their role within the organization, *United States v. Wilson*, 116 F.3d 1066, 1078-79 (5th Cir. 1997). Courts have also relied on testimony that there are clearly delineated rules regarding positions and progression through the organization's hierarchy, that members acted to enhance their reputation generally or in the eyes of a specific faction or individual, about the violent nature of the organization, customs and expectations of members, and acknowledging the importance of maintaining status. *Banks*, 514 F.3d at 970.

Finally, courts have noted when acts are committed or sanctioned by high-ranking members to protect enterprise operations and to advance objectives of enterprise, or where one or more leaders committed the acts in response to a threat posed to the enterprise and to prevent the leaders' positions from being undermined, but not where

acts were "purely mercenary" or defendant was neither a member of the enterprise nor involved in its criminal activity. *United States v. Bruno*, 383 F.3d 65, 83 (2d Cir. 2004). The maintenance concept also applies to high-ranking members of enterprises if they are expected to act and failure to do so would undermine their position in the enterprise. *Smith*, 413 F.3d at 1278 (citing *Dhinsa*, 243 F.3d at 671-72).

The Government presented sufficient evidence in this case for a reasonable jury to find that Napoli engaged in the charged violent conduct to maintain or increase his position within the Breed. With regard to Count II, the Government presented evidence that Burke was assaulted because Breed members questioned his loyalty and dedication to the club. Napoli also attempted to light Burke on fire because he violated a Breed tradition against members sleeping in their colors. Thereafter, Napoli continued to physically assault Burke. Based on this evidence, we conclude that a reasonable jury could find, beyond a reasonable doubt, that Napoli assaulted Burke to enforce Breed rules and codes of conduct, and thereby maintain his position in the organization.

With regard to Count IV, testimony at trial established that Graber's beating occurred because Napoli and other members of the Breed suspected that Graber was stealing money from the club. As a consequence, the Breed executive board unanimously voted to kick Graber out of the club, which consisted of assaulting the expelled or ousted member. From this evidence, a reasonable juror could conclude, beyond a reasonable doubt, that Graber's beating constituted enforcement of Breed discipline, through which

87

Napoli maintained his position.

### b. Collection of Credit by Extortionate Means – Count V

In his Opening Brief, Napoli argues that Count V was improperly joined. He did not assert insufficiency until his Reply Brief. Therefore, Napoli waived this sufficiency argument because "[i]t is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal." *Pelullo*, 399 F.3d at 222. The references in his Opening Brief relating to Count V summarize the charge and contend that the claim was improperly joined. Because this argument was waived, we will affirm this conviction.

### c. Jury Instructions

Napoli contends that the District Court erred in instructing the jury on the VICAR claims. The court instructed the jury that it must find the charged violent crime was "an integral aspect of membership." (R. at 496A.) Napoli argues this standard is insufficient, and that the appropriate standard is that membership enhancement was a "substantial" or "dominant purpose" for committing the violent crimes.[39] The Government responds by arguing that the District Court correctly summarized the state of the law and committed no error. Based on our review of the law in the preceding section, we agree with the Government.

---

[39] Napoli asserts several other jury-instruction errors in his Reply Brief. These arguments were omitted from his Opening Brief and, therefore, are waived. *See Pelullo*, 399 F.3d at 222.

When a party timely objects to jury instructions, "[w]e exercise plenary review to determine whether jury instructions misstated the applicable law, but in the absence of a misstatement we review for abuse of discretion." *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 549 (3d Cir. 1999). Where a party claiming error in a jury instruction failed to make a timely objection, we review for plain error. *Id.* Napoli's counsel did not object to the VICAR jury charge and, therefore, we review for plain error.

The District Court instructed the jury that the Government "must prove beyond a reasonable doubt . . . that the underlying crime of violence was committed for the purpose of maintaining or increasing position in the charged enterprise." (R. at 495A.) The court informed the jury that it "need not . . . find that these purposes were the defendant's sole or even principal motive"; rather, "[i]t is sufficient if the crime of violence was committed as an integral aspect of membership in the enterprise." (R. at 495A-496A.) Alternatively, the court informed the jury that "[i]t is sufficient if you find that the defendant . . . did commit violent crimes because he knew it was expected of him by reason of his membership in the enterprise or that he committed it [sic] in furtherance of that membership." (R. at 496A-497A.) We conclude these instructions are consistent with the state of the law in this area. *See Banks*, 514 F.3d at 969-70 ("By limiting the statute's scope to those cases in which the jury finds that one of the defendant's general purposes or dominant purposes was to enhance his status or that the violent act was committed '*as an integral aspect*' of gang membership, we ensure that the statute is given

its full scope, without allowing it to be used to turn every criminal act by a gang member into a federal crime.") (emphasis added). Therefore, we find no error, plain or otherwise.

### F. Johnson's Self-Incrimination Claim

Johnson contends that the Government violated his privilege against self-incrimination by introducing at trial "non-consensual recordings featuring [his] own voice which were used to incriminate him." (Johnson Br. 61-62.) The Government responds that the statements in the recordings were voluntary and, thus, do not implicate self-incrimination protections. We agree with the Government and, therefore, find no error. [40]

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. This privilege protects against incrimination by a person's own compelled testimonial communications. *See Doe v. United States*, 487 U.S. 201, 207 (1988). Where a statement is voluntary, there is no compulsion. *See United States v. Doe*, 465 U.S. 605, 610 (1984); *see United States v. Patane*, 542 U.S. 630, 637 (2004) (asserting that privilege cannot be violated by introduction of non-testimonial evidence obtained as a result of voluntary statement). Moreover, "surreptitious electronic

---

[40] Generally, an appellate court's review over constitutional issues is plenary. *See Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 165 (3d Cir. 2008). The Government asserts that Johnson failed to raise this objection at trial and, consequently, review is for plain error. *See United States v. Campbell*, 295 F.3d 398, 404 (3d Cir. 2002) (reviewing alleged constitutional violation for plain error because defendant failed to raise issue to district court). Because we find no error at all, it is unnecessary to determine whether review is plenary or for plain error. *Cf. Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 456 (3d Cir. 1999) (foregoing determination of standard of review where same result would obtain under plenary or plain error review).

recording of conversations among private persons, and introduction of the recording during a criminal trial, do not violate the Fifth Amendment's ban against compulsory self-incrimination because the conversations are not the product of any official compulsion." *Berger v. New York*, 388 U.S. 41, 107 (1967) (White, J., dissenting); *see Olmstead v. United States*, 277 U.S. 438, 462 (1928) (finding no violation where defendants were not induced by compulsion to continually and voluntarily conduct business on telephones, without knowledge of interceptions), *overruled on other grounds by Katz v. United States*, 389 U.S. 347 (1967); *cf. Hoffa v. United States*, 385 U.S. 293, 304 (1966) (concluding no violation occurred where incriminating statements made by defendant in wholly voluntary conversation were relayed at trial by participant in conversation).

Johnson has made no argument that he was compelled to make the incriminating statements on the recordings, nor has he offered any argument to suggest the statements were not otherwise voluntary. Because the privilege against self-incrimination requires some form of legal or factual compulsion, we find the District Court did not err in admitting the recorded statements.

## G. Johnson's Claim for Acquittal

Johnson argues that he is entitled to a judgment of acquittal on three firearm-related convictions. He contends that the Government failed to introduce sufficient evidence that he possessed firearms recovered from jointly occupied premises. The Government responds that it introduced sufficient evidence of constructive possession to

uphold the jury's convictions. We agree with the Government and will affirm the jury's convictions.

Johnson was charged with, and convicted of, violating 18 U.S.C. § 924(c)(1) by possessing a Kel-Tec nine millimeter handgun in furtherance of a drug trafficking offense, and violating § 922(g)(1) as a felon in possession of a firearm, namely the nine millimeter handgun, a .44 caliber Charter Arms revolver, and a 12-gauge pump-action shotgun.

Typically, when reviewing a jury verdict for sufficiency of evidence, we view the evidence in the light most favorable to the Government and sustain the verdict if any rational trier of fact could have found the essential elements beyond a reasonable doubt. *See Cunningham*, 517 F.3d at 177. We will examine the totality of the evidence, both direct and circumstantial, and will credit all inferences in favor of the Government. *Sparrow*, 371 F.3d at 852. If a defendant fails to file a timely motion for judgment of acquittal, however, we review sufficiency of the evidence for plain error. *See United States v. Powell*, 113 F.3d 464, 466-67 (3d Cir. 1997).

Johnson presents this appeal in terms of the District Court's failure to grant a judgment of acquittal. There is no indication in the record, however, that Johnson ever gave the court an opportunity to grant an acquittal because he never moved for one. Therefore, we review for plain error, which we defined earlier. *See Puckett*, 129 S. Ct. at 1429 (defining plain error standard)

92

To establish a violation of § 924(c)(1), the Government was required to establish, beyond a reasonable doubt, that (1) Johnson committed either the crime of conspiracy to distribute and possess with intent to distribute a controlled substance or the crime of possession with intent to distribute; (2) Johnson knowingly possessed a firearm; and (3) Johnson knowingly possessed the firearm in furtherance of the crime of conspiracy or the crime of possession. *See United States v. Bobb*, 471 F.3d 491, 496 (3d Cir. 2006). To establish a violation of § 922(g)(1), the Government was required to establish, beyond a reasonable doubt, that (1) Johnson had previously been convicted of a crime punishable by imprisonment for a term exceeding one year; (2) Johnson knowingly possessed a firearm; and (3) the firearm had passed in interstate commerce. *See United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000). In the context of § 922(g)(1), knowing possession means only that the Government must prove Johnson's awareness that he possessed the firearm – it need not demonstrate Johnson possessed the firearm with intent to cause harm or with knowledge that his possession was unlawful. *Id.*

Possession is an element of both crimes, and a jury could convict Johnson if it concluded that he actually or constructively possessed the guns.[41] *See United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008). Because the guns were not recovered from Johnson's person, the Government must establish constructive possession. *See, e.g., Cunningham*, 517 F.3d at 178. We have stated that

---

[41] Because Johnson argues only that the Government failed to introduce sufficient evidence of possession, we focus only on that element of the crimes.

93

"[c]onstructive possession exists if an individual knowingly has both the power and the intention at a given time to exercise dominion and control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both dominion and control over an object and knowledge of that object's existence."

*Id.* Dominion and control need not be exclusive, but can be shared with others. *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993). "[M]ere proximity to the [gun], or mere presence on the property where it is located or mere association with the person who does control the [gun] or the property, is insufficient to support a finding of possession." *Id.*

The police recovered the nine millimeter handgun during the search of 3632 Morrell Street, a residence Johnson shared with his girlfriend.[42] The agent located the gun, which was loaded, on the top of a dining room hutch. The agent testified, "From where I was sitting, if I took one step to my right I could grab the shoebox [containing methamphetamine]. From where I was sitting if I make one step to my left I could reach up and grab the 9 millimeter off the dining room hutch." (Supp. App. at 164.) The police also recovered some other items from 3632 Morrell Street, including Breed paraphernalia, various records in Johnson's name, drugs and drug paraphernalia, mail addressed to Johnson at the address, and a photograph of Johnson with his girlfriend. In addition, the

---

[42] The Government and its witnesses refer to 3632 Morrell Street and 4648 Bergen Street as Johnson's residences, but no party asserts whether he did or did not own or lease either premise. Further, we reject Johnson's joint occupancy argument "because it erroneously assumes that [his] dominion and control over [the premises] had to be exclusive." *See Iglesias*, 535 F.3d at 156; *Brown*, 3 F.3d at 680 (noting dominion and control can be shared with others).

Government offered testimony from Serviolo that he had observed Johnson possess a firearm in the Morrell Street residence.

During the search of 4648 Bergen Street, a residence Johnson shared with his wife, the police recovered the revolver, which was located in a dresser drawer in an upstairs bedroom. The drawer "contained female clothing, underwear, socks, so on and so forth." (Supp. App. at 192.) The shotgun was found in a closet in the same bedroom, next to Johnson's Breed colors. Police also recovered two photographs of Breed members, including Johnson.

Based on the locations of the weapons and the other materials recovered during the searches, a reasonable juror could conclude that Johnson exercised dominion and control over the premises and the guns therein. The evidence also supports the conclusion that Johnson knew these guns were present in the residences. This is not a case of mere proximity or mere knowledge. *See, e.g.*, *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996); *Brown*, 3 F.3d at 681-82.

Accordingly, a reasonable juror could have found that Johnson constructively possessed the guns in violation of both §§ 922(g)(1) and 924(c)(1). *See Bobb*, 471 F.3d at 496; *Dodd*, 225 F.3d at 344; *see, e.g.*, *Iglesias*, 535 F.3d at 156-57. Thus, we find no error, let alone plain error, in the District Court's failure to order an unsolicited judgment of acquittal.

## H. Sentencing Issues

95

For the following reasons, we will affirm the sentences of Heilman and Napoli in their entirety, but vacate Johnson's sentence of imprisonment and remand for re-sentencing.[43] We will affirm the preliminary order of forfeiture in which the Defendants are jointly and severally liable.

## 1. Napoli

### a. Forfeiture

Napoli contends that the District Court erred in calculating the amount of forfeiture under 21 U.S.C. § 853(a) on the basis of gross receipts rather than profits. He asserts that the Supreme Court's decision in *United States v. Santos*, 128 S. Ct. 2020 (2009), directs us and the District Court to define "proceeds" as "profits." The Government responds that *Santos* interpreted a different statute and, therefore, is not binding precedent in this case. Moreover, the Government asserts that defining "proceeds" in § 853 as "profits" would render the term redundant. We agree with the Government and will affirm the forfeiture order.

The proper interpretation of a statute is a question of law over which we exercise plenary review. *See Elec. Lab. Supply Co. v. Cullen*, 977 F.2d 798, 801 (3d Cir. 1992). The Government argues that we should review for plain error because Napoli failed to raise his instant objection at the proceedings below. Insofar as the lower court did not err

---

[43] Although Defendants all join in each other's appeals, we vacate Johnson's sentence for issues particular to his criminal history. Thus, we need not also vacate Napoli's and Heilman's sentences.

in defining "proceeds" as gross receipts, the applicable standard of review on this issue is immaterial.

The parties dispute the meaning of the term "proceeds" in the criminal forfeiture provision of the Comprehensive Drug Abuse Prevention and Control Act.[44] 21 U.S.C. § 853(a). The statute does not define "proceeds." When determining the meaning of undefined statutory language, we first consider the plain meaning of the word. *See In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005). As the Supreme Court noted in *Santos*, "proceeds" is defined as both receipts and profits. *See Santos*, 128 S. Ct. at 2024 (citing 12 Oxford English Dictionary 544 (2d ed. 1989); Random House Dictionary of the English Language 1542 (2d ed. 1987)); *see also* Webster's New International Dictionary 1807 (3d ed. 1965) (defining proceeds as "what is produced by or derived from something . . . by way of total revenue" or "the net profit made on something"). When statutory language "is susceptible to different interpretations, we must look to the

---

[44] Section 853, in relevant part, provides:

"Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law–

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;
. . . .
. . . In lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds."

21 U.S.C. § 853(a)(1).

surrounding words and provisions and their context." *Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (noting "cardinal rule that a statute is to be read as a whole"). We must then determine whether both definitions, when read in the context of the remainder of the provision, remain applicable. *See Santos*, 128 S. Ct. at 2024; *Velis v. Kardanis*, 949 F.2d 78, 81 (3d Cir. 1991) (asserting that interpreting court should also consider context of statutory language).

This is where § 853(a) diverges from the analysis of 18 U.S.C. § 1956(a)(1) in *Santos*. If we were to define "proceeds" as profits, we would render the term superfluous because another provision in § 853(a) permits imposition of a fine against a defendant who "derives profits or other proceeds" in an amount "not more than twice the gross profits or other proceeds." 21 U.S.C. § 853(a). If "proceeds" means profits, then the fine would be imposed against a defendant who "derives profits or other [profits]" and could be no greater than "twice the gross profits or other [profits]," rendering the provision redundant. Because we cannot define a statutory term in a manner which renders it superfluous, we conclude that "proceeds" in § 853(a) means "receipts." *See Tavarez*, 372 F.3d at 190 ("If possible, we must give effect to every clause and word of a statute, and be reluctant to treat statutory terms as surplusage.") (quotation marks, alterations, and citations omitted). Consequently, the District Court did not err in entering a forfeiture order equal to the gross receipts of the drug conspiracy.

Contrary to Napoli's argument, we are not bound by the Supreme Court's holding in *Santos*. Most notably, the Court was interpreting a different statute in a different section of the United States Code. *See Santos*, 128 S. Ct. at 2023 (construing provision of federal money laundering statute, 18 U.S.C. § 1956(a)(1)). Further, a term with multiple meanings does not always retain its definition from one statute to another. *See Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 468 U.S. 137, 174-75 (1984) (O'Connor, J., dissenting) ("Congress need not, and frequently does not, use the same term to mean precisely the same thing in two different statutes . . . ."). In addition, the statutory framework in *Santos* did not present the same redundancy issue present in § 853(a). The money-laundering statute only used the term proceeds throughout, *see* 18 U.S.C. § 1956; *Santos*, 128 S. Ct. at 2024, whereas the Comprehensive Drug Abuse Prevention and Control Act uses both proceeds and profits, and as indicated above, uses both in the same subsection, *see* 21 U.S.C. § 853(a). Furthermore, *Santos* invoked the rule of lenity in interpreting a criminal statute, *Santos*, 128 S. Ct. at 2025, whereas § 853 is a criminal forfeiture provision and does not define a substantive criminal offense, *see Libretti v. United States*, 516 U.S. 29, 39 (1995) ("[C]riminal forfeiture [i]s an aspect of punishment imposed following conviction of a substantive criminal offense."), and it instructs courts that its "provisions . . . shall be liberally construed to effectuate its remedial purposes," 21 U.S.C. § 853(o); *see United States v. Vampire Nation*, 451 F.3d 189, 202 n.12 (3d Cir.

99

2006); *see also United States v. Fleet*, 498 F.3d 1225, 1230 (11th Cir. 2007) ("The remedial purpose of § 853 is to enforce 'the old adage that crime does not pay.'").

Finally, defining proceeds as receipts is consistent with how other courts have defined the term. *See United States v. Bucci*, 582 F.3d 108, 124 (1st Cir. 2009) (approving jury instruction that defined "proceeds" in § 853(a) as "gross proceeds"); *United States v. McHan*, 101 F.3d 1027, 1041-42 (4th Cir. 1996) (defining § 853's reference to "proceeds" as gross proceeds, not profits). *But see United States v. McCarroll*, No. 95-CR-48, 1996 U.S. Dist. LEXIS 8975, at *22-25 (N.D. Ill. June 19, 1996) (deducting cost of drugs from gross proceeds to determine forfeiture amount); *United States v. Milicia*, 769 F. Supp. 877, 888, 890 (E.D. Pa. 1991) (relying on interpretations of other forfeiture provisions to conclude "proceeds" under § 853(a) means revenue less cost of goods sold).

For these reasons, we will affirm the District Court's calculation of the forfeiture amount.

### b. Drug Quantity and Enhancements Found by Preponderance

Napoli argues that the District Court violated his Sixth Amendment right to a trial by jury when it determined the drug quantity attributable to him and other enhancements by a preponderance of the evidence standard. Notably, Napoli does not contend that the substance of the court's findings were erroneous. The Government contends that the court's action is consistent with the state of the law and, therefore, was not erroneous.

100

We agree with the Government and will affirm the District Court's findings.

We review the District Court's factual findings relevant to the Guidelines for clear error and exercise plenary review over the court's interpretation of the Guidelines. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2006) (en banc). In *Grier*, we held that once the jury finds the facts regarding the elements of an offense, triggering the statutory maximum sentence, the judge may impose a sentence anywhere under that maximum without a jury determination beyond a reasonable doubt. *Id.* at 561. As such, facts relevant to application of the Guidelines, which do not increase the maximum penalty to which the defendant is exposed, do not trigger concerns for the defendant's rights to a jury trial and proof beyond a reasonable doubt. *Id.* Moreover, judicial fact-finding in the course of selecting a sentence within the permissible range does not offend Fifth and Sixth Amendment rights. *Id.* at 565-66. We have noted these principles extend to the court's findings regarding drug quantity attributable to the defendant. *United States v. Wise*, 515 F.3d 207, 219 n.7 (3d Cir. 2008).

In this case, the jury found Napoli guilty of conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine, the largest quantity covered by the applicable statute. *See* 21 U.S.C. § 841(b)(1)(A). The statutory maximum sentence for this conviction is life imprisonment. *See id.* Thus, any finding of fact relevant to the Guidelines in this case would not increase the maximum penalty to which Napoli was exposed. *See Grier*, 475 F.3d at 561. Accordingly, the District Court was

entitled to find the drug quantity and applicability of enhancements under a preponderance of the evidence standard, so long as there were sufficient indicia of reliability to support its probable accuracy. *See United States v. Givan*, 320 F.3d 452, 463 (3d Cir. 2003). Notably, Napoli does not challenge the accuracy of those findings, and we find that there were sufficient indica of reliability supporting them. Accordingly, we will affirm the District Court's application of the Guidelines by a preponderance of the evidence.

### c. Drug Quantity Disparity

Napoli argues that the District Court erred by failing "to consider the inequity of the sentencing disparity" in the Guidelines for methamphetamine and powder cocaine. (Napoli Br. 73.) He contends that the disparity is contrary to policy considerations. The Government construes Napoli's argument as an attack against the reasonableness of his sentence and the propriety of the District Court's sentencing procedure. We will affirm Napoli's sentence.

In the context of the crack/powder cocaine 100:1 disparity, the Supreme Court has stated that district courts may consider such disparity in determining an appropriate sentence. *See Kimbrough v. United States*, 552 U.S. 85, 91 (2007). Moreover, district courts would not abuse their discretion if they concluded the disparate sentence yielded a sentence greater than necessary. *Id.* at 110. Thus, the Court has sanctioned consideration of the disparity from a policy perspective. *See Spears v. United States*, 129 S. Ct. 840,

102

843-44 (2009) ("[W]e now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a *policy* disagreement with those Guidelines.") (per curiam) (emphasis added).  Even assuming the same concerns would arise for the 10:1 methamphetamine/cocaine disparity, it would still merely permit the District Court to consider it as just another factor in imposing an appropriate sentence. *See, e.g.*, USSG § 2D1.1(c)(1) (establishing base offense level for at least 150 kilograms of cocaine, ten times larger than methamphetamine minimum of 15 kilograms for same offense level); 18 U.S.C. § 3553(a)(4) (setting established Guidelines range as factor for sentencing court to consider).

Accordingly, the issue then becomes, as the Government recognizes, whether the District Court complied with its procedural and substantive obligations in imposing Napoli's sentence.  We review the District Court's sentence for an abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 41 (2007); *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).

We engage in a procedural and substantive review of sentences. *See United States v. Lessner*, 498 F.3d 185, 203 (3d Cir. 2007).  Procedurally, the District Court must (1) correctly calculate the applicable Guidelines range; (2) formally rule on the motions of both parties and state on the record whether the court is granting a departure and how that departure effects the Guidelines range; and (3) consider all of the factors under 18 U.S.C.

§ 3553(a)[45] and adequately explain the chosen sentence in a manner that allows for meaningful appellate court review of the reasonableness of the sentence. *See Gall*, 552 U.S. at 49-50; *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). The sentencing court should set forth enough to satisfy the reviewing court that it has considered the parties' arguments and has a reasoned basis for exercising its own legal decision-making authority. *Rita v. United States*, 551 U.S. 338, 356 (2007); *see United States v. Jackson*, 467 F.3d 834, 841 (3d Cir. 2006) (stating court must recognize and respond to parties' non-frivolous arguments).

Substantively, we must be satisfied that the District Court exercised its discretion by considering the relevant § 3553(a) factors and we must also ascertain whether those factors were reasonably applied to the circumstances of the case. *See United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006). "Ultimately, the touchstone of reasonableness is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *Tomko*, 562 F.3d at 568 (quotation marks and alteration omitted). The sentencing court need not "discuss and make findings as to each of the § 3553(a) factors if the *record* makes clear the court took the factors into account in sentencing." *Id.* (quotation marks omitted). "[T]he substantive

---

[45] These factors include: (1) the nature and circumstances of the offense and the defendant's history; (2) the need to reflect the seriousness of the crime and to adequately deter criminal conduct; (3) the available sentences; (4) the established sentencing range; (5) any pertinent sentencing policies; (6) the need to avoid sentencing disparities; and (7) the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1)-(7).

reasonableness of each sentence must be evaluated on its own terms, based on the reasons that the district court provided, in light of the particular facts and circumstances of that case." *Id.* at 574; *see id.* at 567 (stating court must focus on the totality of the circumstances).

After reviewing the record we are satisfied the District Court complied with its procedural obligations regarding Napoli's sentence. The court accurately calculated Napoli's sentence under the Guidelines, ruled on Napoli's only motion for departure, provided meaningful analysis under the § 3553 factors, and adequately explained the chosen sentence.

Substantively, the District Court acted reasonably and did not abuse its discretion in imposing a sentence below the Guidelines range. Napoli asserts that the court erred by failing to take into account the "inequity of the [10:1] sentencing disparity" between methamphetamine and cocaine. (Napoli Br. 73.) The court, however, need not address each § 3553(a) factor so long as it is clear from the record the court considered the parties' arguments.[46] *Tomko*, 562 F.3d at 568. According to the Supreme Court, the drug disparity is one such factor the court may, but need not, consider. In this case, the court heard and comprehended Napoli's argument on the issue and ultimately imposed a sentence below the Guidelines range. The District Court clearly considered the nature and seriousness of the crimes, as well as the attendant violence, as the most important

---

[46] For this reason, we need not address the Government's argument that the District Court's failure to explicitly address the disparity argument was harmless.

factors.  It is clear from the record that the court gave rational and meaningful consideration to the § 3553(a) factors, including Napoli's disparity argument.  Therefore, we find the sentence reasonable and will affirm.

### d.  Sentence Exceeded Statutory Maximums

In his Reply Brief, Napoli contends that the District Court erred by sentencing him to 432-months' imprisonment on all counts, thereby exceeding the statutory maximum for several of his convictions.

Notwithstanding the fact that Napoli waived this argument by failing to present it in his initial brief, it is without merit and misunderstands the District Court's action at the sentencing hearing.[47]  *See Pelullo*, 399 F.3d at 222 ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.").  Napoli contends that USSG § 5G1.2 precluded the District Court from imposing a sentence on a count which exceeds the statutory maximum for the offense.  For example, Napoli argues that his VICAR convictions carried a twenty-year maximum, which the court's 432-month sentence clearly exceeds.  Contrary to Napoli's assertion, § 5G1.2 addresses situations where the total punishment exceeds all applicable statutory maximums, thereby necessitating consecutive sentences to impose the total punishment.  *See United States v. McLeod*, 251 F.3d 78, 82 (2d Cir. 2001).  The total punishment, in turn, is calculated based on the combined offense level under § 3D1.4, which governs the

---

[47]  Napoli's argument makes no reference to the Government's Brief and does not otherwise appear to respond to any of the Government's arguments.

offense-level calculation for multiple offenses. *See* USSG § 3D1.5. As indicated above, § 3D1.4(c) directed the court to disregard Napoli's other convictions, which it did.

If the statutory maximum for the conviction carrying the highest maximum exceeds the total punishment, then all sentences will run concurrently. *See* USSG § 5G1.2(c) & comment. (n.1); *United States v. Velasquez*, 304 F.3d 237, 241 (3d Cir. 2002). The statutory maximum imposed for the drug conspiracy conviction coincides with the Guidelines' total punishment of life imprisonment. Further, none of the other applicable statutes mandates a consecutive sentence in this case. *See* USSG § 5G1.2(c) (noting sentences will not run concurrently if applicable statute mandates consecutive sentences); 18 U.S.C. § 894(a)(2); *id.* § 922(g)(1); *id.* § 1959(a)(3). As such, all other sentences would run concurrently. Therefore, Napoli's sentence of 432-months' imprisonment complies with the Guidelines and his argument of error lacks merit.

2. Heilman

a. Criminal History Departure

In sentencing Heilman, the District Court granted a one-level downward departure for Heilman's criminal history category of VI because it found his category "substantially over-represents the seriousness of [his] criminal history and, therefore, [reduced his] criminal history category to [V]." (R. at 564A.) The court noted it was limited to a one-level criminal history departure under the Guidelines because of Heilman's career offender status. Further, the court asserted, and Heilman's counsel agreed, that an

offense-level departure is a separate issue.

On appeal, Heilman argues that the District Court erred because it "mistakenly believed that it could only depart downward by one criminal history category level . . . and could not reduce the sentencing level." (Heilman Br. 23-24.) Heilman contends that the limitation in § 4A1.3(b)(3) "relates to the criminal history only and does not limit departures in the offense level." (*Id.* at 24.) The Government responds that Heilman's reliance on *United States v. Shoupe*, 35 F.3d 835 (3d Cir. 1994), which permitted criminal history and offense level departures, is misplaced in light of an amendment to the Guidelines eliminating offense level departures under § 4A1.3(b).

We will affirm the District Court's one-level criminal history departure. Although we dismissed the Government's present argument on this issue in *United States v. Grier*, 585 F.3d 138 (3d Cir. 2009), *Grier*'s conclusion precludes Heilman's argument for an offense level departure under § 4A1.3(b)(1).

"If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." USSG § 4A1.3(b)(1). However, "[t]he extent of a downward departure . . . for a career offender . . . may not exceed one criminal history category." *Id.* § 4A1.3(b)(3)(A).

In *Grier*, we held that "the 2003 amendment to USSG § 1B1.1, which added a

definition of 'departure' for purposes of § 4A1.3, prohibits district courts from making downward departures in offense level and supersedes our prior holding to the contrary in *Shoupe*." 585 F.3d at 145; *see* USSG § 1B1.1 comment. (n.1(E)) (defining "departure" for purposes of § 4A1.3 to mean "assignment of a *criminal history category* other than the otherwise applicable *criminal history category*, in order to effect a sentence outside the applicable guideline range") (emphases added). We reasoned that "the inclusion of criminal history category in the definition without mention of offense level expresses the Commission's intent to preclude offense level departures under § 4A1.3." *Grier*, 585 F.3d at 143. And we noted that "[w]hile § 4A1.3(b)(3)(A) limits the *extent* of a downward departure under § 4A1.3, it is the definitional amendment at § 1B1.1 that limits the *type* of departure available under § 4A1.3." *Id.* Accordingly, the District Court did not err in declining Heilman's request to grant an offense level departure under § 4A1.3(b).

The court also did not err in departing only one criminal history category. Because the court concluded, and Heilman does not dispute, that he is a career offender under § 4B1.1 based on his prior convictions, the court could not grant a departure in excess of one criminal history category. *See* USSG § 4A1.3(b)(3)(A); *see also Williams v. United States*, 503 U.S. 193, 201 (1992) (holding that where policy statement prohibits a specified action, it is an authoritative guide to the meaning of the applicable Guideline and failure to follow it could result in an incorrect application of the law); *United States v.*

*Freeman*, 316 F.3d 386, 390 n.3 (3d Cir. 2003) (noting § 4A1.3 is an authoritative guide).

Therefore, the District Court properly applied the Guidelines.

b. Reasonableness of Sentence

We review the District Court's sentence for an abuse of discretion, *see Gall*, 552 U.S. at 41; *Tomko*, 562 F.3d at 567, and ask whether the final sentence was premised on appropriate judicious consideration of the relevant factors, *United States v. Schweitzer*, 454 F.3d 197, 204 (3d Cir. 2006). We review both the court's procedure and the substance of the sentence. *See Lessner*, 498 F.3d at 203.

The District Court satisfied its procedural obligations in this case. The court correctly noted the base offense level for a drug conspiracy conviction involving 454 grams (one pound) of methamphetamine is thirty (30). *See* USSG § 2D1.1(c)(5); *see also Grier*, 475 F.3d at 561 (holding that district court may find facts relevant to sentencing by preponderance of the evidence without violating right to jury trial, so long as findings do not elevate sentence beyond statutory maximum). The court also applied a two-level enhancement for possession of a dangerous weapon in connection with the drug conspiracy. The court then found that Heilman is a career offender under USSG § 4B1.1 because (1) he was over the age of eighteen at the time of the instant offense, (2) the instant offense concerned a controlled substance, and (3) Heilman has at least two prior felony convictions for crimes of violence or controlled substances. *See* USSG § 4B1.1(a). Accordingly, the court was required to, and did, increase the offense level to thirty-four

110

(34) in light of the statutory maximum sentence of forty years' imprisonment.[48] *See* USSG § 4B1.1(b); 21 U.S.C. § 841. Because Heilman is a career offender, his criminal history category is automatically VI. *See* USSG § 4B1.1(b). The court, however, reduced his criminal history category to V because it found the category over-represented his record. *See* USSG § 4A1.3(b). The Guidelines range for an offense level of thirty-four (34) and a criminal history category of V is 235 to 293 months, which the court correctly noted. The District Court also considered Heilman's additional departure request for his medical conditions, which the court did not grant.

Finally, the Court adequately considered the § 3553(a) factors and sufficiently explained its chosen sentence at the bottom of the established Guidelines range. The court recited each of the factors and then concluded that a sentence of 235-months' imprisonment was appropriate under the totality of the circumstances, considering the nature and seriousness of the crime committed, the need to deter criminal conduct, the need to protect society from drugs and Heilman, and Heilman's history and character. Further, the court considered and responded to the parties' arguments, notably Heilman's age and medical history, Heilman's criminal history, and testimony and evidence

---

[48] Heilman also argues that the District Court improperly applied a two-level enhancement for possession of a dangerous weapon in connection with the drug conspiracy. *See* USSG § 2D1.1(b)(1). Insofar as that enhancement increases Heilman's offense level to thirty-two (32), whereas his career-offender status mandates an offense level of thirty-four (34), we need not consider the propriety of applying the dangerous weapon enhancement. Nevertheless, we find no error in the District Court's application of the enhancement with respect to the knives, swords, dagger, and pick axe. *See United States v. Drodzowski*, 313 F.3d 819, 822-24 (3d Cir. 2002).

regarding Heilman's character.

We also find that the District Court did not abuse its discretion in imposing a reasonable sentence. Heilman bears the burden of demonstrating unreasonableness, *see Cooper*, 437 F.3d at 332, and there is no presumption of reasonableness even if the sentence is within the Guidelines range, *id.* at 331-32.[49]

Heilman focuses his arguments on the substantive unreasonableness of his sentence, contending that the court only considered the seriousness of the offense, failing to address his other arguments. The Government argues that Heilman has failed to meet his burden of showing unreasonableness. We agree with the Government and will affirm the sentence.

There is nothing in the record that would suggest the District Court's sentence abused the court's discretion or is unreasonable. The court was an active participant in the sentencing colloquy, listening to the parties' arguments and interposing relevant queries, and hearing testimony from a witness and Heilman. Thus, we cannot say that the District Court failed to consider the arguments raised by the parties. The court identified the relevant sentencing factors and applied them to the circumstances of this case in a reasonable manner. *See Cooper*, 437 F.3d at 329-30; *see also Tomko*, 562 F.3d at 568 (noting court need not address each factor if clear from record court considered them).

---

[49]    In its brief, the Government invites us to adopt a presumption of reasonableness for a sentence within the Guidelines range. There is no reason to accept such an invitation in this case because the District Court's sentence is patently reasonable.

112

In this case, the District Court considered the totality of the circumstances and imposed a sentence at the bottom of the Guidelines range, well aware the Guidelines are advisory. The court reasoned that the sentence would address the seriousness of the crime, deter criminal conduct, and protect society from drugs and Heilman. Further, the court considered Heilman's history and current circumstances, including his medical record, in determining the sentence. Although the court did not explicitly address each factor, it is clear from the record that it considered them. Finally, the court provided justified reasons for either granting or declining Heilman's requested departures. As such, we conclude "the record as a whole reflects rational and meaningful consideration of the factors enumerated," *Tomko*, 562 F.3d at 568, and affirm Heilman's sentence.

### 3. Johnson

We agree with Johnson that the District Court erred by relying on his prior conviction for simple assault in determining that he was a career offender under USSG § 4B1.1(a). We will therefore vacate his sentence and remand for re-sentencing. On remand, the District Court should also be aware that the Supreme Court recently granted certiorari on another sentencing issue Johnson asserts – the imposition of a consecutive sentence under § 924(c)(1). *See United States v. Abbott*, 574 F.3d 203 (3d Cir. 2009), *cert. granted*, 130 S. Ct. 1284 (Jan. 25, 2010) (No. 09-479).[50]

---

[50] One of the questions presented by *Abbott* is: "Does the term 'any other provision of law' include the underlying drug trafficking offense or crime of violence?" Petition for Writ of Certiorari at (i), *Abbott v. United States*, No. 09-479 (U.S. petition for cert. granted Jan. 25, 2010). The Court consolidated the appeal with *Gould v. United States*,

The Government concedes that a crime committed with recklessness is not sufficient under either definition of "crime of violence" in USSG § 4B1.2(a). It contends, however, that we should review the charging documents for Johnson's simple assault and conclude that he committed his simple assault intentionally or knowingly and, therefore, committed a crime of violence. We decline the Government's invitation to consider the particular facts of Johnson's conviction, and vacate the sentence and remand for re-sentencing. [15]

"We exercise plenary review over questions of law, such as whether a crime is a crime of violence." *United States v. Stinson*, 592 F.3d 460, 462 n.1 (3d Cir. 2010) (quoting *United States v. Hull*, 456 F.3d 133, 137 (3d Cir. 2006)). We must determine

which asks, does "a mandatory minimum sentence provided by 18 U.S.C. § 924(c)(1)(A) appl[y] to a count when another count already carries a greater mandatory minimum sentence?" Petition for Writ of Certiorari at (i), No. 09-7073 (U.S. petition for cert. granted Jan. 25, 2010).

[51] A defendant is a career offender if (1) he or she was at least 18 at the time of the instant offense, (2) the instant offense is a felony conviction for either a crime of violence or a controlled substance offense, and (3) he or she has at least two prior felony convictions for either a crime of violence or a controlled substance offense. USSG § 4B1.1(a). "Crime of violence" is defined in § 4B1.2(a).

The District Court concluded Johnson is a career offender based on an aggravated assault conviction and a simple assault conviction. Johnson disputes the characterization of the simple assault conviction as a crime of violence. Because we conclude Johnson's simple assault may not be a crime of violence, he lacks the requisite two prior convictions to attain career offender status. Thus, the District Court's finding, which resulted in an increase of Johnson's criminal history category from III to VI (with a subsequent one-level departure for over-representation), would warrant a reversal, even though Johnson was nonetheless sentenced below the otherwise applicable Guidelines range. *Cf. United States v. Knight*, 266 F.3d 203, 205-07, 208 (3d Cir. 2001) (finding application of erroneous Guidelines range affects defendant's substantial rights).

114

whether a conviction for a Pennsylvania simple assault is a "crime of violence."

A prior conviction is for a "crime of violence" if it is (1) an offense under federal or state law punishable by imprisonment for a term exceeding one year,[52] that (2) "has as an element the use, attempted use, or threatened use of physical force against the person of another" (the "Use Clause") or "otherwise involves conduct that presents a serious potential risk of physical injury to another" (the "Residual Clause"). USSG § 4B1.2(a). Because the District Court offered no analysis for its conclusion that Johnson was a career offender, we are at a loss as to which clause it believed Johnson qualified under.[53] Therefore, we must consider whether a Pennsylvania simple assault qualifies as a crime of violence under either clause.

We previously concluded that a Pennsylvania simple assault qualifies as a crime of violence under the Residual Clause in *United States v. Dorsey*, 174 F.3d 331, 333 (3d Cir. 1999). The validity of that position, however, has come under serious attack since the Supreme Court's decision in *United States v. Begay*, 553 U.S. 137 (2008), established a

---

[52] Pennsylvania simple assault, punishable by up to two years' imprisonment, satisfies this first element of a crime of violence. *See United States v. Johnson*, 587 F.3d 203, 209 n.6 (3d Cir. 2009).

[53] The only explanation the District Court offered was that "because of the combined adjusted offense level, [Johnson is] deemed a career offender under the advisory sentencing guidelines." (R. at 598A.) This does not explain how the court reached its conclusion, and there is no basis in the Guidelines for determining career-offender status based on the combined adjusted offense level. Although a sentencing court may need to increase an offense level because of career-offender status, the Guidelines do not provide for the converse. *See, e.g.*, USSG § 4B1.1(b).

new framework for identifying a "crime of violence" under the Residual Clause. *See United States v. Johnson*, 587 F.3d 203, 207 & n.4 (3d Cir. 2009). To the extent *Dorsey* conflicts with *Begay*, we have concluded that we are no longer bound by *Dorsey*. *Id.* at 207 n.4. We are constrained to reach the same result as *Johnson* based on the similarity of circumstances between the two cases.

*Johnson* acknowledged that it confined its analysis to the Residual Clause, and noted that "[i]n light of the government's new position that reckless conduct does not qualify as a crime of violence, we have no occasion to consider whether Johnson's simple assault conviction is a crime of violence to the extent he acted recklessly." *Id.* at 210. The Government has made the same representation in this case, and has extended that position to the Use Clause as well. Therefore, we similarly have no occasion to consider whether Johnson's simple assault is a crime of violence to the extent he acted recklessly.

*Johnson* employed the categorical approach to classify a prior conviction, but noted that Pennsylvania's simple assault statute, 18 Pa Cons. Stat. § 2701, "plainly criminalizes distinct types of conduct, all of which could constitute simple assault." *Id.* at 208-09. Thus, it was necessary to employ the modified categorical approach, which permits courts to look beyond the statutory elements to determine the particular part of the statute of which the defendant was actually convicted. *Id.* at 208. We are limited, however, to examining the statutory definition, the charging documents, any written plea agreement and the transcript of a plea colloquy, and any explicit factual finding by the

116

trial judge to which the defendant assented (the "*Shepard* materials"). *Id.* (citing *Shepard v. United States*, 544 U.S. 13, 16 (2005)). We may not consider whether the defendant's actual conduct would constitute a crime of violence.[54] *Id.*

Based on the Government's concession that recklessness was not sufficient, *Johnson* next considered whether an intentional or knowing violation of Pennsylvania's simple assault statute would constitute a crime of violence under the Residual Clause. *Id.*

---

[54] The modified categorical approach "is not meant to circumvent the categorical approach by allowing courts to determine whether the actual conduct of the individual defendant constituted a purposeful, violent and aggressive act." *Johnson*, 587 F.3d at 208 (quoting *United States v. Smith*, 544 F.3d 781, 786 (7th Cir. 2008)). Our analysis remains faithful to this Circuit's expressed understanding of the modified categorical approach. *See Stinson*, 592 F.3d at 463 (acknowledging *Johnson*'s "reminder that the Supreme Court's decision in *Shepard* foreclosed the court from inquiring into the facts underlying the earlier conviction").

Therefore, the dissent's contention that we can look at the underlying documents is misplaced. The dissent argues that we can look to the underlying criminal complaint to discern the *mens rea* with which Johnson acted. To the extent we can look at the document, it is only to determine with which *mens rea* Johnson was charged and convicted under the statute, which would be entirely consistent with the modified categorical approach. *See Johnson*, 587 F.3d at 208. We cannot consider Johnson's actual conduct to determine with which *mens rea* he acted on the particular occasion, which is precisely the course pursued by the dissent. Moreover, the dissent's approach implicates the exact concerns which constrain our review of the underlying documents – the cursory judgment in this case does not indicate why or for what *charged* conduct Johnson was *actually* convicted. *See Shepard*, 544 U.S. at 25-26 (noting constitutional concerns of re-trying prior convictions). Furthermore, as noted, we can discern no difference between the circumstances of this case and *Johnson*, which informs our decision here.

The criminal complaint and judgment do not answer this question for us, and that is as far as we may pursue the analysis under existing Supreme Court precedent. *See also Chambers v. United States*, 129 S. Ct. 687, 694 (2009) (Alito, J., concurring) ("[O]nly Congress can rescue the federal courts from the mire into which . . . *Taylor*'s 'categorical approach' [has] pushed us.").

117

at 210-11.  We had "no trouble concluding that such a violation would qualify."  *Id.* at 211.  Even if we similarly concluded that an intentional or knowing commission of simple assault would constitute a crime of violence under the Use Clause, *see, e.g.*, *United States v. Rutherford*, 54 F.3d 370, 373-74 (7th Cir. 1992) (asserting that Use Clause applies to intentional acts only), *overruled on other grounds by Begay*, 553 U.S. 137, we would still be in the same position as *Johnson*, which next considered whether the *Shepard* materials established that Johnson "act[ed] with one of those intents," *Johnson*, 587 F.3d at 212.

Our Johnson was "adjudged guilty" of violating 18 Pa. Cons. Stat. § 2701(a)(1), which criminalizes "attempts to cause or intentionally, knowingly or recklessly caus[ing] bodily injury to another."  18 Pa. Cons. Stat. § 2701(a)(1).  Because the Government concedes reckless conduct is not sufficient under either the Use Clause or the Residual Clause, and § 2701(a)(1) plainly criminalizes reckless conduct, we next look to the *Shepard* materials to determine with which simple assault Johnson was charged.  *See Johnson*, 587 F.3d at 209.  Much as in *Johnson*, the criminal information for our Johnson charged that he "knowingly, intentionally or recklessly caused/attempted to cause serious bodily injury to the complainant . . . by repeatedly punching him in the face and head and striking him on the head with and [sic] unknown object, causing injury requiring medical treatment . . . including 4 stitches in the back of his head."  (Supp. App. at 766).  *Compare Johnson*, 587 F.3d at 209.

We observe that

"[t]he information largely tracks the statutory language in § 2701(a)(1), thereby charging Johnson with different types of simple assault. Admittedly, the information's allegation that Johnson ['repeatedly punch[ed the victim] in the face and head and str[uck] him on the head with and [sic] unknown object'] strongly suggests that his conduct was intentional and knowing. Under the particular circumstances presented here, however, we do not believe that we can conclusively determine, based on the information alone, whether Johnson actually [was adjudged guilty of] acting intentionally or knowingly. Accordingly, we must decline the government's invitation to engage in what is . . . a speculative exercise that could implicate the very concerns the Supreme Court has expressed in explaining the prohibition on inquiries into the factual predicates of a defendant's crime under these circumstances."

*Johnson*, 587 F.3d at 212-13 (footnote omitted). Much as *Johnson* could not determine to which *mens rea* its Johnson pled guilty, we cannot determine for which *mens rea* our Johnson was adjudged guilty. Moreover, resort to the Presentence Investigation Report is similarly unavailing as it was in *Johnson* because it merely restates the facts underlying the charge and conviction. *See id.* at 212 n.10. Although *Johnson* explicitly confined its holding to the Residual Clause and the fact that it was not considering whether reckless conduct would suffice because of the Government's concession, *id.* at 207, 210, we are faced with a similar concession, which also extends to the Use Clause. Moreover, it is unclear from the District Court's sentencing and the parties' briefs which clause we should be considering.

Inasmuch as reckless conduct would not suffice under either clause according to the Government, and insofar as we cannot identify which *mens rea* Johnson was found to have, we cannot conclude that he committed a second crime of violence. Thus, the

District Court erred in sentencing him as a career offender. We will vacate Johnson's

sentence and remand for re-sentencing. [55]

IV.

For the foregoing reasons, we will affirm the Defendants' convictions in all

respects. We also will affirm the sentences of Napoli and Heilman in whole, but we will

vacate Johnson's sentence and remand for re-sentencing.

---

[55] We briefly address Johnson's other sentencing issues for the parties' and the District Court's convenience at re-sentencing. Contrary to Johnson's arguments, a sentencing court does not violate a convicted defendant's Fifth and Sixth Amendment rights to a trial by jury and finding of guilt beyond a reasonable doubt by making findings of fact by a preponderance for sentencing enhancements which do not lead to a sentence exceeding the statutory maximum. *See Grier*, 475 F.3d at 561, 565-66; *see also United States v. Ali*, 508 F.3d 136, 146 (3d Cir. 2007) ("After *Booker*, the statutory maximum to which *Apprendi* and *Blakely* refer is the maximum punishment in the U.S. Code for a certain crime."). In such circumstances, Guideline provisions are not elements of the offense. *See, e.g.*, *United States v. Barbosa*, 271 F.3d 438, 457 (3d Cir. 2001). Furthermore, the statutory maximum for Johnson's drug conspiracy conviction is life imprisonment. 21 U.S.C. § 841(b)(1)(A).

In addition, the evidence of drug quantity presented by the Government in this case stands in contrast to the evidence we found insufficiently reliable in *United States v. Miele*, 989 F.2d 659, 663-66 (3d Cir. 1993). *See also United States v. Leekins*, 493 F.3d 143, 150 (3d Cir. 2007) ("The sentencing court had the benefit of observing [Loebsack's] testimony and it can infer reliability from a witness's words and actions.").

Finally, a sentencing court does not violate a defendant's Fifth Amendment privilege against self-incrimination by granting leniency to cooperating defendants and withholding leniency from those who do not, unless the court acts in retaliation or for vindication. *See Corbitt v. New Jersey*, 439 U.S. 212, 223-24 (1978); *United States v. Jeffers*, 570 F.3d 557, 571 (4th Cir. 2009); *see also United States v. Warner*, 338 F.3d 258, 265-67 (3d Cir. 2003).

JORDAN, *Circuit Judge*, dissenting in part

The majority concludes that Johnson's conviction for simple assault does not qualify as a crime of violence under § 4B1.2(a) – and that he is therefore not a career offender under § 4B1.1 – because it is unclear whether he acted intentionally or recklessly in violating the Pennsylvania simple assault statute, 18 Pa. Cons. Stat. Ann. § 2701. I would hold that the charging document, i.e., the underlying criminal complaint associated with Johnson's simple assault conviction, demonstrates that the state charged and was prosecuting Johnson for an intentional assault. The sentencing enhancement applied by the District Court is thus justified and I respectfully dissent from that portion of the opinion holding otherwise.

A conviction qualifies as a crime of violence under § 4B1.2(a) if it meets three requirements, two of which are expressly stated in the Guidelines and one of which arises through judicial interpretation. First, the Guidelines require that the crime be punishable by a term of imprisonment exceeding one year. U.S. SENTENCING GUIDELINES MANUAL § 4B1.2(a) (2007) [hereinafter "U.S.S.G."]. Second, the crime must be either expressly enumerated in § 4B1.2(a)(2), or it must have "as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* § 4B1.2(a)(1). Third, the Guidelines have been interpreted to require that the defendant commit the underlying crime with an intentional *mens rea*. *See Begay v. United States*, 553 U.S. 137, 147-48 (2008) (concluding that a prior crime qualifies as a violent felony under the Armed Career Criminal Act, 18 U.S.C. § 924(e), only if the defendant committed it with an intentional

*mens rea*); *United States v. Johnson*, 587 F.3d 203, 210-11 (3d Cir. 2009) (applying the reasoning of *Begay* to the term "crime of violence" as used in § 4B1.2(a)).

The majority concludes that the simple assault committed by Johnson does not qualify as a crime of violence because a simple assault conviction may rest upon recklessness as well as intentional and knowing conduct. 18 Pa. Cons. Stat. Ann. § 2701(a)(1). My colleagues believe that we cannot discern whether the state's basis for the assault charge was an intentional or reckless act by Johnson. They therefore conclude that his conviction does not fall within the scope of § 4B1.2. I disagree.

As the majority observes, § 2701 criminalizes multiple forms of simple assault, only some of which implicate an intentional mental state. Therefore, we must follow the modified categorical approach to determine whether Johnson's conviction constitutes a crime of violence under § 4B1.2. *Johnson*, 587 F.3d at 208 (stating that we employ the modified categorical approach when "a statute criminalizes different kinds of conduct, some of which would constitute crimes of violence while others would not"). Under that approach, we may examine "the nature of the conviction itself and those elements that the [fact-finder] necessarily found through an examination of judicial evidence." *Nijhawan v. Att'y Gen. of the U.S.* 523 F.3d 387, 393 (3d Cir. 2008). In undertaking that examination, we may consider "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or ... some comparable judicial record of this

information." *Shepard v. United States*, 544 U.S. 13, 26 (2005). The modified categorical approach can only be used to identify those facts that form the essential basis of the defendant's conviction; it does not permit delving into facts that were not necessary to establish the crime for which the defendant was ultimately convicted. *Johnson*, 587 F.3d at 208.

The modified categorical approach can appropriately be used to determine whether Johnson committed the crime of simple assault with an intentional mental state. *Cf. id.* at 212-14 (recognizing that a Pennsylvania simple assault may be predicated upon either intentional or reckless conduct and remanding to the district court to identify the mental state with which the defendant acted). The criminal complaint from Johnson's state court proceedings charged that he "knowingly, intentionally or recklessly caused/attempted to cause serious bodily injury to the complainant ... by repeatedly punching [the victim] in the face and head and striking him on the head with and [sic] unknown object, causing injury requiring medical treatment ... including 4 stitches in the back of his head." (Supp. App. at 766.) Although the complaint does not expressly state a particular *mens rea* with which Johnson acted, it is clear that the beating Johnson administered was intentional and was the only conduct at issue. This is not an impermissible delving into facts extraneous to the conviction. It is rather a recognition of the sole basis of the charge and conviction.

Accordingly, I would apply the modified categorical approach to identify the *mens rea* supporting Johnson's convictions, and, based on the criminal complaint, would agree

with the District Court that he acted in an intentional manner when he violated § 2701. I thus believe that the District Court properly found that Johnson qualified as a career offender under § 4B1.1, and I would affirm the sentence the Court imposed. In all other respects, I join my colleagues in the thorough majority opinion in this case.